# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| M. AKIFUR RAHMAN, NIAZ ANWAR, KHALID BHATTI, SHIMROTE ISHAQUE, OUSSAMA JAMMAL, ELIE R. KHOURY, FARIDEH KHOURY, and SAMMY U. REHMAN, on behalf of themselves and all similarly situated persons; and MASOODA RAHMAN and RIFFAT MEHMOOD, on behalf themselves and all similarly situated persons, ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, ) | No. 05 C 3761 |
| ) | |
| v. ) | Judge Ronald A. Guzmán |
| ) | |
| MICHAEL CHERTOFF, Secretary of the U.S. Department of Homeland Security, in his official capacity; ROBERT S. MUELLER III, Director of the Federal Bureau of Investigation, in his official capacity, W. RALPH BASHAM, Commissioner of U.S. Customs and Border Protection, in his official capacity; and JULIE L. MYERS, Assistant Secretary of U.S. Immigration and Customs Enforcement, in her official capacity, ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

The named plaintiffs, on behalf of all others similarly situated, have sued various

government officials seeking declaratory and injunctive relief because defendants' policies and

practices, which purportedly cause repeated, lengthy and abusive border detentions of innocent

U.S. citizens, allegedly violate their civil rights under the Fourth and Fifth Amendments. Before

the Court is defendants' objection to Magistrate Judge Sidney I. Schenkier's Report and

Recommendation ("R&R") in which he recommends that the Court certify two classes. Also

before the Court is defendants' motion to dismiss the Second Amended Complaint pursuant to

Federal Rule of Civil Procedure ("Rule") 12(b)(1) and (b)(6). For the following reasons, the

Court rejects defendants' objections, adopts Magistrate Judge Schenkier's R&R in full, and grants in part and denies in part defendants' motion to dismiss.

## Facts

Plaintiffs are law-abiding U.S. citizens, who were either born or have lived in the U.S. for many years. (Second Am. Compl. ¶¶ 14-21.) They travel outside of the U.S. regularly for business and pleasure. (*Id.*) Each has been detained at least two times upon reentering the U.S. and some have been detained for over five hours.

Michael Chertoff is the Secretary of the Department of Homeland Security ("DHS"). (*Id.* ¶ 22.) Robert S. Mueller III is the Federal Bureau of Investigations ("FBI") Director. (*Id.* ¶ 23.) W. Ralph Basham is the Customs and Border Protection ("CBP") Commissioner. (*Id.* ¶ 24.) The CBP is a component of the DHS and responsible for protecting U.S. airports, seaports and land border crossings. (*Id.* ¶ 24.) Julie L. Myers is the Assistant Secretary of Immigration and Customs Enforcement ("ICE"). (*Id.* ¶ 25.) The ICE is a component of DHS, and has primary responsibility for investigating violations of our nation's customs and immigration laws. (*Id.*) All of these individuals are sued solely in their official capacity. (*Id.* ¶¶ 22-24.)

The Terrorist Screening Center ("TSC"), administered by the FBI, compiles the Terrorist Screening Database ("TSDB") (*Id.* ¶ 33.) The TSC includes in the TSDB, or watch list, all individuals that are believed by the federal government to have "any degree of terrorism nexus." (*Id.*) The TSDB allegedly includes more than 200,000 names, with each person being assigned a code to "depict the type of terrorist threat they purportedly present, and the manner in which they are to be treated by law enforcement officials." (*Id.* ¶¶ 3, 4.) The TSC makes the TSDB watch list available to federal, state and local law enforcement personnel nationwide. (*Id.* ¶ 34.) The TSC also provides a call-in center to assist such personnel in determining whether encountered

2

individuals are on the TSDB list and if so, how law enforcement should respond. (*Id.* ¶ 36.) The DHS uses the TSDB watch list to screen U.S. citizens seeking reentry after travel abroad. (*Id.* ¶ 35.)

Plaintiffs allege that defendants have two principal policies that result in prolonged border detentions and cause improper treatment and conditions of confinement of members of the proposed classes. (*Id.* ¶ 39.) First, defendants act with deliberate indifference to plaintiffs' constitutional rights by knowingly over-classifying U.S. citizens by mischaracterizing the level of threat they pose to the U.S., *i.e.*, by stating that they pose a substantial threat or are armed and dangerous when they do not qualify for such a classification and failing to check whether information contained in the TSDB watch list is accurate or based on reliable information. (*Id.* ¶ 4.) Second, defendants act with deliberate indifference when they repeatedly misidentify U.S. citizens whose names are similar to or the same as individuals on the TSDB watch list, as being someone on the TSDB watch list. (*Id.* ¶ 5.) Both policies exist because defendants do not have in place a system that ensures accurate classification and identification because the TSC is "plagued by poor management, flawed information technology systems, and a lack of operational protocols and policies." (*Id.* ¶ 40.) Further, these policies exist because the TSDB contains erroneous and inconsistent data within individual records and conflicting data among duplicate records. (*Id.*) These policies have the effect of prolonging and exacerbating detentions of overclassified or misidentified United States citizens and their families while reentering the country to the point of being nonroutine border searches. (*Id.*). Plaintiffs solely seek to enjoin defendants from continuing the alleged policies. (*Id.* ¶¶ 31-32.)

Plaintiffs seek certification of two classes: a "Primary Traveler Class" and a "Family Detainee Class." (*Id.* ¶¶ 27, 28.) The "Primary Traveler Class" includes: "All United States citizens who now are and/or in the future will be subjected to detentions upon reentry to the

3

United States as a result of defendants' contested policies, practices and customs. The "Family Detainee Class" includes: "All persons who now are and/or in the future will be subjected to detention upon reentry to the United States as a result of defendants' contested policies, practices and customs and because they are a family member of and traveling with a member of the primary traveler class. (R&R 1-2, 22-23.) On January, 17, 2007, Magistrate Judge Sidney I. Schenkier recommended certification of both classes. (*Id.* 22-23.)

## Discussion

Rule 72 provides for the referral of pretrial matters to a magistrate judge. Fed. R. Civ. P. 72. Under this rule, the magistrate's order may be subject to review by a district court judge. *See id.* However, a motion for class certification may not be decided independently by a federal magistrate judge. 28 U.S.C. § 636(b)(1)(A). Accordingly, the district court has the authority to make the final determination on the motion and must "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C).

Defendants argue that Magistrate Judge Schenkier incorrectly granted plaintiffs' motion for class certification based on four grounds. First, plaintiffs do not have standing in their own right, and thus they may not litigate as representatives of a class. (Defs.' Objections R&R 5.) Second, plaintiffs' classes are overbroad. (*Id.*) Third, plaintiffs have not properly satisfied Rule 23(a)'s numerosity requirement so as to make joinder impractical. (*Id.*) Fourth, plaintiffs' claims are not typical of the certified class because establishing that class members' Fourth Amendment rights were violated would require individualized determinations based on widely varying facts. (*Id.* 5-6.)

This Court is "mindful of the Supreme Court's directive to consider issues of class certification prior to issues of standing." *See Payton v. County of Kane*, 308 F.3d 673, 680 (7th Cir. 2002) (citing *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999)); *see also* Fed. R. Civ. P. 23(c) ("As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained."). Accordingly, the Court addresses the class certification issues first.

## I. Motion for Class Certification

Rule 23 governs class certification determinations. Fed. R. Civ. P. 23. "[A] determination of the propriety of class certification should not turn on likelihood of success on the merits." *Payton*, 308 F.3d at 677. If the party seeking class certification meets its burden of showing that the certification requirements are satisfied, the court must certify the proposed class. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982); *see Vickers v. Trainor*, 546 F.2d 739, 747 (7th Cir. 1976). The court maintains broad discretion to determine whether a proposed class satisfies the requirements and should err in favor of maintaining class actions. *King v. Kansas City S. Indus.*, 519 F.2d 20, 26 (7th Cir. 1975); *see Patterson v. Gen. Motors Corp.*, 631 F.2d 476, 480 (7th Cir. 1980).

"While there is nothing explicit in Rule 23 . . . , many courts have held that there is a definiteness requirement implied in Rule 23(a)." *Alliance to End Repression v. Rochford*, 565 F.2d 975, 977 (7th Cir. 1977). Thus, the class must be "sufficiently definite to permit ascertainment of the class members." *Id.*

As stated above, plaintiffs seek certification of two proposed classes. The "Primary Traveler Class" includes: "All United States citizens who now are and/or in the future will be subjected to detentions upon reentry to the United States as a result of defendants' contested

5

policies, practices and customs." The "Family Detainee Class" includes: "All persons who now are and/or in the future will be subjected to detention upon reentry to the United States as a result of defendants' contested policies, practices and customs and because they are a family member of and traveling with a member of the primary traveler class." (R&R 1-2, 22-23.)

Defendants argue that the class definitions are fatally overbroad because the classes now include U.S. citizens who have been subject to border detentions of any kind. It is true that plaintiffs amended the class definitions to delete the word "unreasonable" as a descriptor of the detentions and now disavow basing their claims on any policy, practice or custom that would require an individual determination of liability as to each class member.[1] (Pls.' Reply Mem. Supp. Class Certification 12-13.) However, as the Court sees it, plaintiffs' theory is that when a U.S. citizen is overclassified on the watch list or misidentified as someone on the watch list, the U.S. citizen and his or her family members are automatically subject to unreasonable detention upon entry to the U.S. in violation of the Fourth Amendment.[2] (See Pls.' Reply Mem. Supp. Class Certification 10-11.) This may end up being a tougher row to hoe for plaintiffs when it comes to establishing that once a U.S. citizen is subject to overclassification or misidentification, constitutional violations occur as a matter of course, but that is the path they have chosen.

Defendants also argue that the class definitions are overly broad because it is unclear whether the proposed class members have all suffered a constitutional violation. Given the Court's interpretation of plaintiffs' narrowed claims, the class includes only those who are

---

[1]The Court takes no position as to whether it was necessary to delete this phrase in order to pass muster under Rule 23.

[2]The Court notes that at any time during the course of litigation, it has discretion to decertify the class. *Eggleston v. Chi. Journeymen Plumbers, Local Union No. 130*, 657 F.2d 890, 896 (7th Cir. 1981) (stating that "[i]f the certification of the class is later deemed to be improvident, the court may decertify").

6

subject to defendants' overclassification and misidentification policies which causes a *per se* unreasonable detention violative of the Fourth and Fifth Amendments.

Defendants also argue that membership in the class is too hypothetical or conjectural because it requires a merit-based inquiry into whether defendants' policies, practices and customs violate the U.S. citizens' Fourth and Fifth Amendment rights. Defendants' argument ignores other cases in which courts have certified Rule 23(b)(2) classes alleging violations of the Fourth and Fifth Amendments. *See, e.g., Alliance to End Repression*, 565 F.2d at 978 (affirming certification of Rule 23(b)(2) class alleging Chicago police practice of dossier collection, surveillance, harassment, physical and verbal coercion and summary punishment violated Fourth and Fifth Amendments); *Ill. Migrant Council v. Pilliod*, 540 F.2d 1062, 1065 (7th Cir. 1976), *modified on other grounds*, 548 F.2d 715 (7th Cir. 1977) (case in which court had certified class alleging INS' practice of searches and detentions violated Fourth and Fifth Amendments); *see LaDuke v. Nelson*, 762 F.2d 1318, 1324 (9th Cir. 1985), *amended on other grounds*, 796 F.2d 309 (9th Cir. 1986) (noting that certified class alleging INS border patrol's practice of searching migrant housing violated Fourth Amendment raised a justiciable case and controversy); *Anderson v. Conejo*, 199 F.R.D. 228, 238 (N.D. Ill. 2000) (certifying class alleging U.S. Customs' policy and practice of conducting nonroutine searches violated the Fourth and Fifth Amendments). This also ignores those cases in which courts have certified classes that include members who will be subject to future violations of the Fourth Amendment. *See Alliance to End Repression*, 565 F.2d at 976 (affirming certification of class that included organizations that "hereafter may be . . . subjected to or threatened by" practice sought to be enjoined); *Caroline C. ex rel. Carter v. Johnson*, 174 F.R.D. 452, 461 (D. Neb. 1996) (listing cases in which courts have certified or affirmed the certification of classes that included persons

who would be subjected to unlawful policies in the future); *Westefer v. Snyder*, Nos. 00-162-GPM, 00-708-GPM, 2006 WL 2639972, at *10 (S.D. Ill. Sept. 12, 2006) (same).

In support, defendants cite *Adashunas v. Negley*, 626 F.2d 600, 601-04 (7th Cir. 1980), where the court held that a class defined as "all children within the State of Indiana entitled to a public education who have learning disabilities who are not properly identified and/or who are not receiving such special instruction as to guarantee them of minimally adequate education" was too diverse and unascertainable to be certified because a battery of tests was required to identify a learning disabled child and the level of their disability. However, the claims of the putative class in *Adashunas* challenged the state's failure to identify learning disabled children such that identification of each class member was essential to the claim and the relief sought. *See id.* The claims of the putative classes in the instant action challenge policies which defendants use to classify and identify all U.S. citizens seeking reentry to the U.S. such that it is unnecessary to identify each citizen affected. While defendants repeatedly emphasize the *consequences* of the policies, *e.g.*, unreasonable detention, plaintiffs have disavowed basing their claims on policies that would require any individualized determination of liability as to each class member. Rather, the putative classes seek to enjoin defendants' policies and practices of overclassifying and misidentifying U.S. citizens, which, if corrected, would eliminate the *per se* constitutional violations.

Defendants also rely on *Swain v. Brinegar*, 517 F.2d 766, 779-80 (7th Cir. 1975). In *Swain*, where the plaintiffs sought to enjoin a particular proposed highway project, the court held that the class definition was overinclusive because it included owners, tenants and users of farm land in Illinois who were not subject to having their land condemned for the proposed highway project. *Id.* In contrast to *Swain*, the class definition in this case includes only those U.S.

8

citizens who are subject to defendants' contested policies of overclassification and misidentification that automatically lead to unreasonable detention.

In opposition to the motion for class certification, defendants also cited *Oshana v. Coca-Cola Bottling Co.*, 225 F.R.D. 575, 580 (N.D. Ill. 2005), *aff'd*, 472 F.3d 506 (7th Cir. 2006). In *Oshana*, the named plaintiff sued Coca-Cola for damages pursuant to the Illinois Consumer Fraud Act for misrepresenting that fountain Diet Coke and canned/bottled Diet Coke were the same product although only fountain Diet Coke contained saccharin. *Id.* Pursuant to Rule 23(b)(1)(B) and/or 23(b)(3), plaintiff sought to certify a class defined as "[a]ll individuals who purchased for consumption and not resale fountain diet Coke in the State of Illinois from March 12, 1999, through the date of the entry of an order certifying the class." *Id.* at 578. The *Oshana* court held that "the proposed class definition is overly inclusive and encompasses millions of potential members without any identifiable basis for standing" because it included all purchasers and not only those who relied on defendant's misrepresentation. *Id.* at 580. The court further held that "[c]lass membership implies a state of mind element that requires an individual examination of each class member" because class members would be required to show they were misled or deceived. *Id.* at 581.

In contrast to the class definition in *Oshana*, the instant case is not one in which membership in the classes is dependent on a prospective member's state of mind. *See Gomez v. Ill. State Bd. of Educ.*, 117 F.R.D. 394, 397 (N.D. Ill. 1987). The scope of the prospective class may be defined by reference to the defendant's conduct, *i.e.*, their policies, practices and customs in overclassifying or misidentifying persons via the watch list. *See Alliance to End Repression*, 565 F.2d at 978. To establish membership in either the Primary Traveler class or the Family Detainee class, one need only establish that he or she is a U.S. citizen or a family member of and

9

traveling with the U.S. citizen, who has sought or will seek reentry to the U.S., and is either overclassified on the watch list or misidentified as being someone on the watch list.

Furthermore, in contrast to *Oshana*, the putative classes in the instant case seek solely a prospective injunction, relief that will inure to all class members rendering specificity of the class definition less critical. *See Westefer*, 2006 WL 2639972, at *10 ("[W]here class certification is sought under Rule 23(b)(2), precise definition [of the class] is not as important as it may be under other class certification rules, given that the relief sought is predominantly equitable relief against a defendant's allegedly unlawful conduct directed to the class as a whole." (quotation omitted)).

The Court finds *Alliance to End Repression v. Rochford*, 565 F.2d at 978, similar to the case at bar. In that case, the appellate court held that the district court did not abuse its discretion when it certified two classes, one of which consisted of:

all residents of the City of Chicago, and all other persons who are physically present within the City of Chicago for regular or irregular periods of time, who engage or have engaged in lawful political, religious, educational or social activities and who, as a result of these activities, have been within the last five years, are now, or hereafter may be subjected to or threatened by alleged infiltration, physical or verbal coercion, photographic, electronic, or physical surveillance, summary punishment, harassment, or dossier collection, maintenance, and dissemination by defendants or their agents.

*Id.* at 976. The appellate court rejected defendants' argument that the classes were too indefinite because they were defined by the activities of the defendants, *e.g.*, the pattern of allegedly unconstitutional harassment by the defendants. *Id.* at 978. As in *Alliance to End Repression*, the scope of the classes in the instant case is defined by the activities of the defendants, *e.g.*, the policies, practices and customs of unconstitutional detention by the defendants that allegedly violate the Fourth and Fifth Amendment rights of members of the classes.

For all of the reasons discussed, the Court finds the class definitions appropriately limited. Thus, the threshold definiteness requirement has been satisfied.

## A. Rule 23(a) Requirements

Rule 23(a) requires that:

(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). The moving party has the burden to establish that each of the prerequisites of Rule 23(a) are satisfied. *Gen. Tel. Co. of S.W.*, 457 U.S. at 161; *Valentino v. Howlett*, 528 F.2d 975, 979 (7th Cir. 1976). If all of the elements of Rule 23(a) are satisfied, the moving party must also show that the action is maintainable under Rule 23(b)(1), (2), or (3). *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 611-13 (1997).

Defendants first argue that plaintiffs have not properly satisfied Rule 23(a)'s numerosity requirement. (Defs.' Objections R&R 5.) To do so, plaintiffs must show that the proposed classes are so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a). "[P]laintiffs are not required to specify the exact number of persons in the class, but cannot rely on conclusory allegations that joinder is impractical or on speculation as to the size of the class in order to prove numerosity." *Marcial v. Coronet Ins. Co.*, 880 F.2d 954, 957 (7th Cir. 1989) (citations omitted). Plaintiffs may establish impracticability based on good faith estimates. *Young v. County of Cook*, No. 06 C 552, 2007 WL 1238920, at *2 (N.D. Ill. Apr. 25, 2007). Further, whether joinder is impracticable depends on: "(1) the class size; (2) the geographic dispersion of class members; (3) the type of relief sought by the class; and (4) the practicability

of relitigating a common core issue." *Radmanovich v. Combined Ins. Co. of Am.*, 216 F.R.D. 424, 431 (N.D. Ill. 2003).

In support of numerosity, plaintiffs cite an audit report published by the U.S. Department of Justice that states that during the period of December 1, 2003 to January 23, 2005, 7,755 (or 42%) of the 18,447 total calls to the TSC did not match up with any name in the TSDB. (Mem. Supp. Mot. Class Certification, Ex. 2, Review of the Terrorist Screening Center, Audit Report 05-27 (June 2005).) Although the TSC receives calls from other agencies as well as Customs and Border Protection, calls from Customs and Border Protection account for 67% of the total calls. (*Id.*) Thus, even if only 67% of the 7,755 calls regarding misidentified persons concern reentry at the U.S. borders, that would amount to 5,165 people. Further, because 40% of people entering the U.S. are U.S. citizens, plaintiffs project that the number of U.S. citizens detained due to the contested misidentification policies, practices and customs is 2,066, which makes joinder impracticable.[3] Although the Court recognizes that merely because 40% of people entering the country are U.S. citizens does not necessarily mean that 40% of the misidentified persons are U.S. citizens, it would be unreasonable to assume that nearly all of the misidentified persons entering the country are not U.S. citizens. Thus, the Court holds that plaintiffs have established beyond mere speculation that the size of their putative classes is sufficiently large.

As for other considerations regarding impracticability of joinder, like the named plaintiffs, who live in Illinois, Massachusetts, New York, Washington, Michigan, and Wisconsin, the members of the proposed nationwide classes are geographically dispersed throughout the country. The classes seek declaratory and injunctive relief to prevent

___

[3] It is reasonable to infer from this conclusion that the size of the Family Detainee Class with regard to the misidentification policies, customs, and practices will be equal to, if not greater than, the size of the Primary Traveler Class.

constitutional violations as to future plaintiffs, making joinder of those plaintiffs impossible. In addition, it would be highly impracticable to relitigate the common core issue of whether the overclassification and misidentification policies cause *per se* constitutional violations. In sum, given the data presented and after weighing all of the other considerations, the Court holds that plaintiffs have sufficiently established numerosity as to both classes.

Next, defendants argue that plaintiffs' claims are not typical of the certified class because establishing that class members' Fourth Amendment rights were violated would require individualized determinations based on widely varying facts. "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) (quotation omitted).

Defendants argue that because there are factual variations as to border stops of U.S. citizens, typicality is lacking. As discussed above, plaintiffs now have disavowed basing their claims on any policy, practice or custom that would require an individual determination of liability as to each plaintiff. Thus, they allege that being either on the watch list or misidentified as someone on the watch list automatically triggers defendants' unconstitutional treatment of a class member when reentering the country. (*See* Pls.' Reply Mem. Supp. Class Certification 10 ("Defendants' written policies command ICE investigators to subject overclassified and misidentified citizens to substantial intrusions.").) Further, they seek solely injunctive and declaratory relief. Thus, the named plaintiffs' claims arise from the same practice or course of conduct that gives rise to the claims of other class members and their claims are based on the same legal theory. In sum, the Court finds that plaintiffs have established typicality.

13



**FBI**
DIRECTOR: Robert
S. Mueller III

**DEPARTMENT OF
HOMELAND SECURITY
(SECRETARY: MICHAEL
CHERTOFF)**

**TERRORIST SCREENING
CENTER**

Compiles the TERRORIST
SCREENING DATABASE.

**IMMIGRATION AND CUSTOMS
ENFORCEMENT
ASSISTANT SECRETARY: JULIE L. MYERS**

Primary responsibility for investigating violations
of our nation's customs and immigration laws.

**CUSTOMS AND BORDER PROTECTION
(COMMISSIONER: W. RALPH BASHAM)**

Responsible for protecting US airports,
Seaport's and land border crossings.

**B. Rule 23(b)(2)**

Plaintiffs in this case seek certification under Rule 23(b)(2), which requires them to establish that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2). "Rule 23(b)(2) operates under the presumption that the interests of the class are cohesive and homogeneous such that the case will not depend on the adjudication of facts particular to any subset of the class nor require a remedy that differentiates materially among class members." *Lemon v. Int'l Union of Operating Eng'rs, Local 139*, 216 F.3d 577, 580 (7th Cir. 2000). "The need for, if not inevitability of, class-wide treatment when injunctive relief is at stake is what Rule 23(b)(2) is about." *Allen v. Int'l Truck & Engine Corp.*, 358 F.3d 469, 471 (7th Cir. 2004).

Plaintiffs' allegations demonstrate their theory that defendants have acted on grounds generally applicable to Primary Traveler plaintiffs, who are overclassified on the watch list or misidentified as being someone on the watch list, and Family Detainee plaintiffs, who travel with a Primary Traveler plaintiff. When a Primary Traveler plaintiff is overclassified or misidentified, defendants' policies mandate officers and investigators to subject them and their family members who are also U.S. citizens, to substantial intrusion upon reentering the U.S. (*See* Pls.' Reply Mem. Supp. Class Certification 10-11.) The Court holds that these classes fall within the purview of Rule 23(b)(2).

"[A] federal court when asked to certify a nationwide class should take care to ensure that nationwide relief is indeed appropriate in the case before it, and that certification of such a class would not improperly interfere with the litigation of similar issues in other judicial districts." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Defendants do not argue, and the Court does not find, that certification of the class will improperly interfere with litigation of

14

similar issues in other judicial districts. Further, the Court has carefully considered defendants' objections to class certification and is confident that it is appropriate in this case. A nationwide class is not "inconsistent with principles of equity jurisprudence, since the scope of injunctive relief is dictated by *the extent of the violation established*, not by the geographical extent of the plaintiff class." *Id.* (emphasis added).[4]

Because the Court finds that the prerequisites for class certification have been satisfied, it rejects defendants' objections to Magistrate Judge Schenkier's ruling in which he recommended granting plaintiffs' motion for class certification and adopts that ruling in full. Accordingly, the Court proceeds to address defendants' motion to dismiss the complaint.

## II. Motion to Dismiss for Lack of Jurisdiction

Defendants move to dismiss the complaint for lack of jurisdiction pursuant to Rule 12(b)(1). In ruling on a Rule 12(b)(1) motion to dismiss, the Court generally accepts as true all well-pleaded factual allegations of the complaint, drawing all reasonable inferences in plaintiff's favor. *Capitol Leasing Co. v. F.D.I.C.*, 999 F.2d 188, 191 (7th Cir. 1993) (per curiam). If, however, "a party properly raises a factual question concerning the [court's] jurisdiction. . . . [t]he district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Grafon Corp. v. Hausermann*, 602 F.2d 781, 783 (7th Cir. 1979) (footnote omitted).

First, defendants argue that plaintiffs lack standing because they have not alleged a real and immediate threat of harm and merely allege past instances of harm. Second, defendants

---

[4]Of course, in the event that injunctive relief is awarded, it must be no more burdensome than necessary to redress the constitutional violations. *See id.*

argue that the plaintiffs' claims are nonjusticiable because the injunctive relief they seek would require excessive interference with the Executive Branch of government.

"Article III of the Constitution confines the federal courts to adjudicating actual cases and controversies." *Allen v. Wright*, 468 U.S. 737, 750 (1984) (quotations omitted). "[T]he 'case or controversy' requirement defines with respect to the Judicial Branch the idea of separation of powers on which the federal Government is founded." *Id.* To establish standing, a plaintiff must demonstrate: (1) "an injury in fact, which is an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) "a causal relationship between the injury and the challenged conduct, such that the injury can be fairly traced to the challenged action of the defendant and not from the independent action of some third party not before the court"; and (3) "a likelihood that the injury will be redressed by a favorable decision." *Perry v. Vill. of Arlington Heights*, 186 F.3d 826, 829 (7th Cir. 1999).

"[P]ast wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury." *O'Shea v. Littleton*, 414 U.S. 488, 495 (1974). Although past exposure to illegal conduct, in and of itself, does not show a present case or controversy, if it is accompanied by allegations of continuing adverse effects, the combination of allegations is sufficient to show a case or controversy regarding injunctive relief. *See id.* at 495-96.

An examination of the facts at hand show that each of the named plaintiffs has established actual and imminent injury in fact. The named plaintiffs have been repeatedly subjected to the defendants' alleged policies upon reentry at U.S. borders or their equivalent as a result of being misidentified or overclassified or traveling with a U.S. citizen so misidentified or overclassified. Plaintiffs allege the TSDB mandates that every law enforcement official approach every person listed on the TSDB watch list with caution, and none on the watch list is

16

categorized as being low-threat. (Second Am. Compl. ¶ 39(a).) Thus, overclassified plaintiffs whose names are erroneously on the watch list and misidentified plaintiffs whose names are the Muslim or Arab equivalent of "John Smith" or similar to those on the watch list are categorized as a threat to the U.S. and thus detained for individual lengthy questioning. Each named plaintiff regularly travels outside of the U.S. for business, tourism or visitation of family and each plans to travel outside of the U.S. in the future. None of the plaintiffs have ever been involved in terrorism, terror-related activity or any other conduct that would provide legal justification for the severe treatment they received based on defendants' policies.

M. Akifur Rahman, a U.S. born citizen of Indian descent, was detained four times in 2004 and 2005, each detainment lasted approximately between 1.5 to 5.5 hours and one detainment involved a body search, seizure of his personal belongings and his being handcuffed to a chair for three hours. His wife, Masooda Rahman, a Canadian born citizen and permanent U.S. resident, and their children were detained while traveling with M. Akifur for over 5.5 hours. The Rahman family regularly travels to Canada to visit family.

Niaz Anwar, who became a U.S. citizen in 1985 and is married to a naturalized U.S. citizen, was detained nine times from 2004-06 and the detainments lasted approximately one to six hours. Anwar owns and operates a store that sells imported clothing and jewelry, which requires him to travel abroad to purchase merchandise. In addition, the Anwar family regularly travels to Canada to visit family.

Dr. Khalid Bhatti, a gastroenterologist who became a U.S. citizen in 1979 and is married to a naturalized U.S. citizen, was detained twice in 2004 and 2005 while traveling with his family, the detainments lasted between approximately 1.5 to 2.5 hours, and one of the detainments involved his being handcuffed and body searched. The Bhatti family regularly travels to Pakistan to visit family.

17

Shimrote Ishaque, a pharmacist who became a U.S. citizen in 1986 and is married to a naturalized U.S. citizen, was detained three times from 2004-2006, the detainments lasted between approximately 2 to 4 hours, and one of the detainments involved federal agents' pointing firearms at him (because the CBP computer system misidentified him as being armed and dangerous) and handcuffing him for over an hour. Ishaque regularly travels abroad to attend religious conferences and to visit relatives.

Oussama Jammal, an engineer who became a U.S. citizen in 2001 and is married to a naturalized U.S. citizen, was detained eleven times in 2002-05, the detainments lasted between approximately 2.5 to 4 hours, and the last detainment involved a body search. Jammal owns and operates a company that produces educational videos for clients including the U.S. Department of State, and his work requires him to travel abroad regularly.

Dr. Elie R. Khoury, an obstetrician and gynecologist, who became a U.S. citizen with his wife Farideh in 1973, was detained seven times during the period of 2002-2005, the detentions lasted an average of 2 hours, and the detainments involved agents' conducting body searches of both Elie and Farideh, watching Elie as he urinated and photocopying documents that they were carrying. The Khourys regularly travel abroad for tourism.

Dr. Sammy U. Rehman, a radiologist, became a U.S. citizen in 1990 and is married to a naturalized citizen, was detained twice in 2005 and the last detainment involved numerous federal agents with their hands on their holstered firearms surrounding the car in which Rehman, his wife, Riffat Mehmood ,and their three young sons were traveling because Rehman was misidentified by the computer system as being armed and dangerous. The Rehmans regularly travel to Pakistan and Canada to visit family.

Viewing the alleged facts, which are uncontradicted by defendants, as true for purposes of the Rule 12(b)(1) motion to dismiss, the Court cannot hold that the threat of unreasonable

18

detainment is merely conjectural or hypothetical. Due to the frequency of the plaintiffs' travel outside of the U.S. and the fact that each has been detained on numerous occasions recently, the Court finds that there is a significant likelihood of their being detained in the future. The fact that plaintiffs have been subjected to lengthy detentions and questioning and have been cleared for entry on prior occasion(s) and yet continue to be similarly detained and questioned each and every time they reenter the U.S., bolsters the Court's conclusion.

For these reasons, the Court finds defendants' cited cases distinguishable. (*See* Defs.' Mem. Supp. Mot. Dismiss 9-14 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *City of Los Angeles v. Lyons*, 461 U.S. 95, 104 (1983); *O'Shea*, 414 U.S. at 495-96; *Sierakowski v. Ryan*, 223 F.3d 440, 444-45 (7th Cir. 2000); *Stewart v. McGinnis*, 5 F.3d 1031, 1038 (7th Cir. 1993); *Knox v. McGinnis*, 998 F.2d 1405, 1414 (7th Cir. 1993); *Robinson v. City of Chi.*, 868 F.2d 959, 966 (7th Cir. 1989)). Unlike the plaintiffs in *Lyons*, *Sierakowski*, *Knox*, and *Robinson*, who were each subjected to the policy sought to be enjoined on one isolated occasion, the plaintiffs in *Lujan* and *O'Shea*, who had never suffered any injury from the policy sought to be enjoined, and the plaintiff in *Stewart*, who failed to establish that the contested policy posed a sufficient threat of harm because he had suffered injury only twice out of the sixty times the policy could have been implemented, the instant named plaintiffs have been detained repeatedly for prolonged periods of time each time they have reentered the country and travel abroad regularly such that the likelihood of them being detained in a similar fashion is sufficient. The Court thus holds that the named plaintiffs have established the injury-in-fact element of standing.

Defendants' objections do not address the other two elements of standing, *i.e.*, cause and redressability. However, the Court finds that: (1) plaintiffs have sufficiently stated a causal connection between defendants' contested overclassification and misidentification policies and plaintiffs' injuries in that they argue that these policies automatically lead to unconstitutional

19

detentions upon plaintiffs' reentry to the U.S. and (2) it is likely that plaintiffs' injuries may be redressed through a favorable decision.[5] Accordingly, the Court denies defendants' motion to dismiss for lack of subject matter jurisdiction on standing grounds.

Next, though they couch it in other terms, defendants argue that the case is nonjusticiable because it falls under the political question doctrine. The political question doctrine "rests primarily on the principle of separation of powers and the policy of judicial self-restraint." *Flynn v. Shultz*, 748 F.2d 1186, 1190 (7th Cir. 1984). As the Supreme Court in *Baker v. Carr*, 369 U.S. 186 (1962), explained:

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

> Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for nonjusticiability on the ground of a political question's presence. The doctrine of which we treat is one of "political questions," not one of "political cases." The courts cannot reject as "no law suit" a bona fide controversy as to whether some action denominated "political" exceeds constitutional authority. The cases . . . show the necessity for discriminating inquiry into the precise facts and posture of the particular case, and the impossibility of resolution by any semantic cataloguing.

*Id.* at 217.

Unlike a lack of federal jurisdiction that ends a case, nonjusticiability does not immediately foreclose any consideration of the matter. *Id.* at 198. Instead, "the Court's inquiry necessarily proceeds to the point of deciding whether the duty asserted can be judicially

---

[5]As discussed below, the Court reserves ruling on justiciability at this time.

identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded." *Id.*

Defendants argue that the complaint does not allege grounds for judicial supervision of their counter-terrorism efforts. Specifically, they contend that federal courts may not direct the operations of government agencies except as necessary to remedy deliberate and systematic violations of individuals' constitutional rights and the complaint does not state an adequate legal basis for the Court to revise and oversee the policies and practices by which defendants identify and investigate potential terrorist threats to national security.

Defendants cite *Rizzo v. Goode*, 423 U.S. 362, 365-78 (1976), in support of their argument. In *Rizzo*, the Supreme Court noted that principles of equity and federalism caution against issuing an injunction against those in charge of an executive branch of an agency of state or local government except in rare situations. *Id.* at 379-80. However, *Rizzo* is distinguishable in that the Court had the benefit of factual findings regarding the precise parameters of the contested policies and procedures as well as the purported constitutional violations such that it could determine whether the case was justiciable. *See id.* at 364-65. The instant case is merely at the pleading stage and it is yet unknown whether there are deliberate and systematic violations of the class members' constitutional rights. As explained above, courts are permitted to proceed with caution to a point in the litigation when justiciability can be determined based on the nature of the purported violations and whether protection against such violations can be judicially molded.

Other cases on which defendants rely are also distinguishable. In *Gilligan v. Morgan*, in which a class comprised of students at Kent State University, in the wake of the tragedy that occurred there in May 1970, sought an injunction against the Governor of Ohio "to restrain him in the future from prematurely ordering National Guard troops to duty in civil disorders" and "to

restrain leaders of the National Guard from future violation of the students' constitutional rights." 413 U.S. 1, 3 (1973). During the pendency of the litigation, the National Guard changed its regulations, obviating the need for the Court to review them because the plaintiff class no longer contested the regulations in force. *Id.* at 11. However, the class also sought continued surveillance over the training, weaponry and orders of the National Guard. *Id.* at 6. The Court held that claim to be nonjusticiable and advisory because the class merely sought to ensure that the National Guard enforced its new regulations in the future. *Id.* at 10. The Court noted that "it should be clear that we neither hold nor imply that the conduct of the National Guard is always beyond judicial review or that there may not be accountability in a judicial forum for violations of law for specific unlawful conduct by military person, whether by way of damages or injunctive relief." *Id.* at 11-12.

*Laird v. Tatum*, 408 U.S. 1 (1972), is another case in defendants' arsenal. In that case, the Court held that a class' complaints of a chilling effect on the exercise of First Amendment rights where such effect was not alleged to be caused by any specific action of the Department of the Army against the class, but by the mere existence and operation of the Army's investigative and data-gathering system, were not justiciable. *Id.* at 3, 11. The Court held that it was not the role of the judiciary to "monitor[] . . . the wisdom and soundness of Executive action . . . absent actual present or immediately threatened injury resulting from unlawful governmental action." *Id.* at 15.

Defendants also cite *Allen v. Wright*, 468 U.S. at 754-56, in which a class of parents of black children attending public schools in districts undergoing desegregation sued the IRS for its failure to adopt adequate standards to deny tax-exempt status to racially discriminatory private schools, which harmed the class by either failing to avoid a violation of law or creating stigmatic injury. The *Allen* Court held that because the class did not seek "to enforce specific legal

22

obligations whose violation works a direct harm, but to seek a restructuring of the apparatus established by the Executive Branch to fulfill its legal duties," the separation of powers doctrine precluded equitable relief. *Id.* at 760-61.

In contrast to *Gilligan*, *Laird*, and *Allen*, the instant case presents actual or threatened injuries, or direct harm, due to defendants' alleged unconstitutional activity in the context of a concrete set of facts. As noted in Justice Blackmun's concurrence in *Gilligan*, "an evaluation . . . in the context of a particular factual setting as a predicate to relief in the form of an injunction against continuing activity or for damages would present wholly different issues." 413 U.S. at 14. Further, as emphasized in the majority opinion in *Laird*, "there is nothing in our Nation's history or in this Court's decided cases, including our holding today, that can properly be seen as giving any indication that actual or threatened injury by reason of unlawful activities of the military would go unnoticed or unremedied." 408 U.S. at 11.

Finding defendants' cases distinguishable, the Court, however, notes that it proceeds with extreme caution, fully aware that "[a]ny rule of constitutional law that would inhibit the flexibility of the political branches of government to respond to changing world conditions should be adopted only with the greatest caution." *Mathews v. Diaz*, 426 U.S. 67, 81 (1976). "[W]hile individual rights are protected carefully, it is within a framework that takes account of the broad substantive power of other branches, and it is clear that respect for the political branches affects but does not preclude, decision on the merits." *Flynn*, 748 F.2d at 1191 (quotations omitted); *see Hamdi v. Rumsfeld*, 542 U.S. 507, 535 (2004) (rejecting argument that separation of powers precluded courts from inquiring into the factual basis of an enemy combatant designation by U.S. military authorities). The Court thus reserves ruling on the justiciability issue at this time and proceeds cautiously to the merits of defendants' motion to dismiss for failure to state a claim.

### III. Motion to Dismiss for Failure to State a Claim

On a motion to dismiss under Rule 12(b)(6), "all factual allegations in the complaint" are accepted as true, and all reasonable inferences from the facts are weighed in plaintiff's favor. *Murphy v. Walker*, 51 F.3d 714, 717 (7th Cir. 1995). The complaint will be dismissed only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). In addition, the Court will construe the complaint liberally and will view the allegations in a light most favorable to the non-moving party. *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir. 1997).

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. CONST. amend. IV. "The touchstone of Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy.'" *Cal. v. Ciraolo*, 476 U.S. 207, 211 (1986) (quoting *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)).

"It is axiomatic that the United States, as sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity." *United States v. Flores-Montano*, 541 U.S. 149, 153 (2004). "The Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border." *Id.* at 152. Accordingly, "the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior." *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985). Thus, the Supreme Court has stated "[t]ime and again . . . that 'searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that

24

they occur at the border.'" *Flores-Montano*, 541 U.S. at 152-53 (quoting *United States v. Ramsey*, 431 U.S. 606, 616 (1977)). This is so because "not only is the expectation of privacy less at the border than in the interior, the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is also struck much more favorably to the Government at the border." *Montoya de Hernandez*, 473 U.S. at 539 (citations omitted).

"Routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant . . . ." *Id.* at 538. "Routine border inspections are those that do not pose a serious invasion of privacy and that do not embarrass or offend the average traveler." *United States v. Johnson*, 991 F.2d 1287, 1291 (7th Cir. 1993). For example, "[a]utomotive travelers may be stopped at fixed checkpoints near the border without individualized suspicion even if the stop is based largely on ethnicity . . . ." *Montoya de Hernandez*, 473 U.S. at 538 (citing *United States v. Martinez-Fuerte*, 428 U.S. 543, 562-63 (1976)). "A search at the border of a traveler's luggage and personal effects is routine. The search of a border entrant's suitcase, purse, wallet, and overcoat simply is not sufficiently intrusive to be considered nonroutine." *Johnson*, 991 F.2d at 1291-92. "[A] perusal of documents or letters to identify the nature of the documents and to verify that they contain no contraband or dutiable items would clearly fall within a routine border search since such an intrusion is minimal." *United States v. Soto-Teran*, 44 F. Supp. 2d 185, 191 (E.D.N.Y. 1996) (stating, however that "once a search of a sealed envelope or package reveals no contraband or dutiable items, a close reading of the contents of documents could intrude on a person's privacy since such documents could deal with very personal matters, such as a diary or desk calendar").

The Supreme Court has noted that a border search is not routine if it involves a strip, body cavity, or involuntary x-ray search, but it has reserved ruling on the level of suspicion required under those circumstances and has remained silent on the issue of pat-down searches.

*Montoya de Hernandez*, 473 U.S. at 541 n.4; *see United States v. Dorsey*, 641 F.2d 1213, 1218

(7th Cir. 1981) (requiring reasonable suspicion for pat-down searches); *see also Kaniff v. United*

*States*, 991 F.2d 780, 785 (2003) (declining to reconsider *Dorsey*, post-*Montoya de Hernandez*).

With regard to an alimentary canal search, the Court has held that "detention of a traveler at the

border, beyond the scope of a routine customs search and inspection, is justified at its inception

if customs agents, considering all the facts surrounding the traveler and her trip, reasonably

suspect that the traveler is smuggling contraband in her alimentary canal." *Montoya de*

*Hernandez*, 473 U.S. at 541. In addition, courts have required reasonable suspicion prior to a

close reading and photocopying of a border entrant's documents. *See United States v. Fortna*,

796 F.2d 724, 738-39 (5th Cir. 1986) (holding photocopying of documents found in border

entrant's carry-on bag was permissible because documents raised suspicion of illegal conduct);

*United States v. Schoor*, 597 F.2d 1303, 1306 (9th Cir. 1979) (holding documents properly

seized by custom officials based on notification that they were instrumentalities of narcotics

crime); *Soto-Teran*, 44 F. Supp. 2d at 191 (applying reasonable suspicion standard to determine

lawfulness of border officials' closely reading and photocopying documents).

The classes, as stated above, allege that defendants' overclassification and

misidentification policies are based on a record keeping system that has no mechanism to ensure

its accuracy and that the policies mandate nonroutine border detentions. Thus, the classes allege

that they are subject to nonroutine border detentions, including but not limited to pat-down body

searches, handcuffing, photocopying of documents, and being detained and held at gunpoint,

without any reasonable suspicion. Whether they will be able to prove that the policies are based

on an illogical record keeping system and mandate repetitive nonroutine border detentions is a

different matter and one not appropriate at this stage in the litigation. Accepting the classes'

version of the facts as true, the Court holds that their allegations are sufficient to put defendants on notice of the classes' Fourth Amendment claims.

With regard to the class' Fifth Amendment claims, defendants argue that: (1) the classes' substantive due process claim fails because they have not alleged that they have been prevented from traveling internationally and (2) the classes' procedural due process claim fails as a matter of law because the classes have failed to allege that CBP officers ever told other travelers their reasons for detaining plaintiffs and because the classes have not alleged an alteration of their legal status, above and beyond mere defamation, to satisfy the "stigma plus" standard.

"[T]he 'right' of international travel has been considered to be no more than an aspect of the 'liberty' protected by the Due Process Clause of the Fifth Amendment." *Califano v. Torres*, 435 U.S. 1, 4 n.6 (1978). Thus, the right "can be regulated within the bounds of due process." *Id.* Courts "do not apply strict scrutiny to restrictions on international travel rights that do not implicate First Amendment concerns." *Eunique v. Powell*, 302 F.3d 971, 973 (9th Cir. 2002). Accordingly, a "seizure and temporary detention . . . would be violative of substantive due process only if it were 'wholly irrational.'" *Duncan v. Goedeke*, 837 F. Supp. 846, 850 (S.D. Tex. 1993) (quoting *Califano v. Aznavorian*, 439 U.S. 170, 177 (1978)).

Defendants first argue that the classes have not adequately alleged that their right to travel internationally has been violated. Defendants argue that short of denying a passport, international travel is not burdened. This Court disagrees.

In *Califano v. Aznavorian*, a class of Supplementary Social Security Income recipients alleged that a provision of the Social Security Act, which barred payment of benefits during any month that the recipient spent entirely outside of the United States, imposed a burden on their freedom of international travel in violation of the Fifth Amendment. 439 U.S. at 172-73. The *Califano* Court held that unless the contested governmental action is "wholly irrational, it is

27

constitutional in spite of its incidental effect on international travel." *Id.* at 177. *Califano* appears to have left the door open for challenges such as the instant one. Some class members have been detained seven to nine times within a three-year period such that it can be said that the right to international travel has been incidentally effected. Further, the classes allege that defendants' overclassification and misidentification policies that mandate nonroutine border detentions of U.S. citizens are caused by defendants' irrational record keeping system. Accordingly, the Court holds that the complaint sufficiently states a substantive due process claim based on the right of international travel.

Next, defendants argue that the classes' procedural due process claim fails as a matter of law. To state a procedural due process claim, a plaintiff must allege a deprivation of a constitutionally protected liberty or property interest and a denial of adequate procedural protections. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982).

The classes allege that they are deprived of a liberty interest in their reputation because they are "single[d] out . . . as security threats in full view of other travelers." (*See* Pls.' Resp. Defs.' Mot. Dismiss 30.) "To be constitutionally cognizable, however, . . . defamation must consist of specific stigmatizing statements that are made public." *Wroblewski v. City of Washburn*, 965 F.2d 452, 456 (7th Cir. 1992); *see Ratliff v. City of Milwaukee*, 795 F.2d 612, 626-27 (7th Cir. 1986) ("In a common law defamation action, any publication of false and defamatory material might be sufficient, but in the context of the liberty interest protected by the Fourteenth Amendment, [plaintiff] was required to show broader publication.").

The Court finds no allegation of specific stigmatizing statements that have been made public in the complaint. Merely "being singled out" at the border does not sufficiently state a procedural due process claim. Plaintiffs have not alleged that any other traveler has been made privy to any information in the watch list database or the reasons for plaintiffs' detention.

Accordingly, the Court agrees with defendants that the classes fail to state a procedural due process claim.[6]

## Conclusion

For the foregoing reasons, the Court rejects defendants' objections to Magistrate Judge Schenkier's R&R in which he recommended certification of the Primary Traveler Class and the Family Detainee Class, and the Court adopts the R&R in full. The Court grants in part and denies in part defendants' motion to dismiss [doc. no. 118]. The Court grants the motion with respect to the classes' procedural due process claim, which is dismissed without prejudice. In all other respects, defendants' motion to dismiss is denied.

SO ORDERED.                    ENTERED: 7/26/07

HON. RONALD A. GUZMAN
United States District Judge

---

[6]Because the Court finds that the classes' have failed to allege that specific defamatory statements were made public, the Court need not reach any other issues raised by defendants.