IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

M. AKIFUR RAHMAN, *et al.*,                )
                                           )
                    Plaintiffs,            )
                                           )      No. 05 C 3761
vs.                                        )
                                           )      District Judge Guzman
MICHAEL CHERTOFF, *et al.*,                )
                                           )      Magistrate Judge Schenkier
                    Defendants.            )

## AMENDED MEMORANDUM OPINION AND ORDER (REDACTED)

In this case, plaintiffs assert class action claims for violation of their rights under the Fourth

and Fifth Amendments to the United States Constitution, all of which they allege flow from the use

of a Terrorist Screening Database ("TSDB"), which plaintiffs allege is administered by the Terrorist

Screening Center ("TSC"), a unit of federal government administered by the Federal Bureau of

Investigation ("FBI").[1]  Eight of the named plaintiffs are individuals who allege that they were

improperly detained and mistreated for one of two reasons: (1) either because they were incorrectly

identified in the TSDB as posing a serious threat to law enforcement officials or national security

(the "overclassification" claim); or (2) because they were mistaken for someone listed in the TSDB

with a name that is the same or similar to theirs (the "misidentification" claim).[2]

---

[1] Plaintiffs have sued the following persons in their official capacities: Michael Chertoff, Secretary of the Department of Homeland Security ("DHS"); Robert S. Mueller III, Director of the FBI; W. Ralph Basham, Commissioner of the United States Customs and Border Protection ("CBP"); and Julie L. Myers, Assistant Secretary of the United States Immigration and Customs Enforcement ("ICE").

[2] A more detailed recitation of the allegations is set forth in several earlier opinions issued by this Court and by the presiding district judge. *See Rahman v. Chertoff*, No. 05 C 3761 (doc. # 202) (N.D. Ill., Jan. 16, 2007) (Report and Recommendation recommending the certification of two classes); *Rahman v. Chertoff*, 244 F.R.D. 443 (N.D. Ill. 2007) (adopting Report and Recommendation on class certification; granting in part and denying in part defendants' motion to dismiss); *Rahman v. Chertoff*, No. 05-3761 (doc. # 254) (N.D. Ill., May 1, 2007) (ruling on plaintiffs' motion to compel discovery and defendants' motion for protective order). We assume familiarity with these earlier rulings and repeat the factual allegations only as relevant to the motion we address in this opinion.

The motion now before the Court represents the aftermath of the Court's May 1, 2007 Memorandum Opinion and Order, in which we granted in part and denied in part both plaintiffs' motion to compel production of documents and defendants' competing motion for protective order. *See Rahman v. Chertoff*, No. 05 C 3761 (Mem. Op. and Order at 35-37) (N.D. Ill., May 1, 2007) (doc. # 254).[3]  In that ruling, the Court granted defendants' requests for additional time, to July 2, 2007, in which to decide whether to assert the state secrets privilege as a bar to some or all of the discovery that the Court required them to produce (*Id.*).  On defendants' motion (doc. # 272), the Court thereafter extended the time for defendants to make any assertion of the state secrets privilege to July 23, 2007 (doc. # 276).

On July 23, 2007, defendants moved for a ruling that the state secrets privilege bars production of some, but not all, of the discovery that the Court ordered them to produce in the May 1, 2007 Memorandum Opinion and Order (doc. # 280). In particular, defendants assert the state secrets privilege bars production of the following material:  (1) information tending to confirm or deny whether the plaintiffs are now or ever have been listed in the TSDB; (2) FBI investigative files of any plaintiffs who may now be or ever have been listed in the TSDB, and any records in the Terrorist Identities Datamart Environment ("TIDE") pertaining to the plaintiffs; and (3) two policy and procedure documents containing classified information about terrorist screening practices (*Id.*, at 1-2).  Between July 23 and September 28, 2007, the parties submitted their respective memoranda and supporting materials in connection with the motion (doc. ## 281, 297, 310).  In addition,

---

[3]We note that defendants have objected to that discovery ruling (doc. #264); those objections are pending.  In addition, on October 1, 2007, the Seventh Circuit granted defendants permission to take an interlocutory appeal of the class certification ruling pursuant to Fed. R. Civ. P. 23(f).  *Rahman v. Chertoff*, No. 07-3430 (7th Cir.).  That appeal remains pending.

between September 24 and October 29, 2007, plaintiffs filed three supplements to their memorandum in opposition to assertion of the state secrets privilege (doc. ## 305, 321, 323). Defendants responded to the first of those supplements when they filed their reply memorandum on September 28, 2007 (doc. # 310); they responded to the second and third supplements in a separate submission filed on November 2, 2007 (doc. # 326).

After reviewing these materials, the Court heard oral argument on the matter on December 4, 2007 (doc. # 331), which led to further written supplementation of the record. On December 21, 2007, plaintiffs supplied the Court with answers they had served in response to Defendant Chertoff's first set of interrogatories, and defendants provided a copy of their responses and objections to plaintiffs' third set of interrogatories. On January 9, 2008, plaintiffs filed a fourth supplement addressing the defendants' December 2007 interrogatory responses (doc. # 339). On January 17, 2008, defendants filed supplemental materials in support of their assertion of the state secrets privilege (doc. ## 345, 347), to which plaintiffs filed a responsive memorandum on January 24, 2008 (doc. # 351). Based on our review of the applicable case law and the parties' submissions, we grant in part and deny in part defendants' assertion of the state secrets privilege.[4]

---

[4] In reaching our decision, we have considered the publicly-filed declarations submitted by the government from Alberto R. Gonzalez, then Attorney General of the United States; J. Michael McConnell, Director of National Intelligence; Gale Rossides, Acting Deputy Administrator (TSA); Andrew Colsky, Director of Sensitive Security Information (Office of Special Counselor, Transportation Security Administration, United States Department of Homeland Security); and, Robert Jacksta, Executive Director, Traveler's Security and Facilitation (CBP) (Defs.' Mem., Doc. # 281, Unmarked Exs.; Defs.' Reply Brief, Doc. # 310, Ex. 1; Defs.' Supplemental Brief, Doc. # 345, Ex. 1). In addition to these publicly-filed documents, the government filed *ex parte*, for *in camera* review, additional declarations containing classified material. The Court has reviewed the classified materials in chambers under strictly controlled security conditions: the materials were maintained in a secure location outside the Court's control; when the Court reviewed the materials, only one copy was brought to chambers; when the Court's review was completed, the materials were returned to the secure location outside the Court's control, along with any notes that the Court made concerning the materials; and, the Court was not permitted to (and did not) discuss the materials with members of its staff. Only Part IV of our publicly-issued decision is premised on our review of the classified materials. We therefore issue today a separate Memorandum Opinion and Order, which will not be publicly filed or available to plaintiffs or their counsel, concerning our reliance on those materials (*see* page 23, *infra*).

# I.

The state secrets privilege allows the government to withhold information that, if disclosed, would present a "reasonable danger . . . [of] . . . jeopardiz[ing] national security." *Zuckerbraun v. General Dynamics Corp.*, 935 F.2d 544, 546-47 (2nd Cir. 1991); *see also United States v. Reynolds*, 345 U.S. 1, 10 (1953) (state secrets privilege applies where there is "a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged"); *Terkel v. AT&T Corp.*, 441 F. Supp.2d 899, 908 (N.D. Ill. 2006) (the state secrets privilege allows the government to "'block discovery of any information that, if disclosed, would adversely affect national security'").[5] Where it applies, the privilege is absolute: "even the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that military secrets are at stake." *Reynolds*, 345 U.S. at 11. As a result, successful invocation of the state secrets privilege may have the harsh result of "rendering a plaintiff unable to establish a *prima facie* case and without a remedy for the violation of her rights." *Terkel*, 441 F. Supp.2d at 908. For that reason, the Supreme Court has cautioned that the state secrets privilege is "not to be lightly invoked." *Reynolds*, 345 U.S. at 7.

Moreover, courts may not uncritically accept the government's assertion of the state secrets privilege. "Judicial control over the evidence in a case cannot be abdicated to the caprice of

---

[5] The parties differ on whether the state secrets privilege finds its roots in common law, as plaintiffs argue (Pls.' Resp. at 2 n.2), or whether it arises from "the President's powers under Article II of the Constitution to conduct foreign affairs and provide for the national defense," as defendants maintain (Defs.' Mem. at 4). The seminal case establishing the state secrets privilege, *Reynolds*, traced the origins of the privilege to common law evidence principles rather than to the Constitution. 345 U.S. at 6-7. We have reviewed the authorities offered by the government in support of the proposition that the state secrets privilege emanates from the Constitution, and we find them unpersuasive. Thus, we agree with the observation of Judge Kennelly in *Terkel* that the state secrets privilege "is a common law evidentiary privilege." 441 F. Supp.2d at 908. That said, we do not consider the source of the state secrets privilege to be germane to whether the defendants have established that the privilege bars the discovery at issue here.

executive officers." *Reynolds*, 345 U.S. at 9-10. At the same time, *Reynolds* instructed courts to determine "whether the circumstances are appropriate for the claim of privilege, and yet do so without forcing a disclosure of the very thing the privilege is designed to protect," a task that the Supreme Court recognized "presents real difficulty." *Id.* at 8.

The Supreme Court made clear in *Reynolds* that a court may not "automatically require a complete disclosure to the judge [of the alleged state secrets information] before the claim of privilege will be accepted in any case." 345 U.S. at 10. In deciding the depth of inquiry a court should make into the government's assertion of the state secrets privilege, the Supreme Court analogized to the level of inquiry a court makes when a witness asserts the privilege against self incrimination. *Id.* at 8-9.

The *Reynolds* court explained that the law rejects both the proposition that "the bare assertion by the witness must be taken as conclusive" in deciding whether a witness may assert the privilege against self incrimination, and the proposition that "the witness should be required to reveal the matter behind this claim of privilege to the judge for verification." *Id.* at 9. The Supreme Court explained that when the privilege against self incrimination is invoked, the compromise between those two extreme positions was that "the court must be satisfied from all the evidence and circumstances, and 'from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result.'" *Id.* If a court is satisfied that answering the question would potentially incriminate the witness, the claim of "the privilege will be accepted without requiring further disclosure;" but, if a court decides that the answer would not be incriminating, then the witness "may answer [the question] without violating the privilege which is

5

secured to him by law." *Id.* The Supreme Court explained that courts "cannot participate with [the witness] in this judgment, because they cannot decide on the effect of [the witness's] answer without knowing what it would be, and disclosure of that fact to the judge would strip [the witness] of the privilege which the law allows and which [the witness] claims." *Id.*

Drawing on this analogy, the Supreme Court in *Reynolds* stated that in considering an assertion of state secrets privilege, "the court must determine whether, 'from all the circumstances of the case, . . . there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged.'" *Reynolds*, 345 U.S. at 10. When that is the case, *in camera* review should not be done, because "the occasion for the privilege is appropriate, and the court should not jeopardize the security which the privilege is meant to protect by insisting upon an examination of the evidence, even by the judge alone, in chambers." *Id.*[6]

To say that an *in camera* review should not be undertaken automatically, or lightly, is not to say that it may never be done. Courts within this Circuit and elsewhere have recognized that *Reynolds* does not bar a court from conducting an *in camera* review when that is necessary to determining the validity of a claim of state secrets privilege. *See, e.g., American Civil Liberties Union v. Brown*, 619 F.2d 1170, 1173 (7th Cir. 1980) (*en banc* opinion) ("a party's showing of need often compels the district court to conduct an *in camera* review of documents allegedly covered by

---

[6]As an aside, the *Reynolds* analysis demonstrates how the particular analogy that a court selects can foreordain the answer to a legal question. Consider, for example, how the *Reynolds* analysis may have led to a different result if the Supreme Court had chosen to analogize to the attorney client privilege or work product doctrine rather than to the privilege against self incrimination. When a party asserts attorney client privilege or work product protection for a particular document, courts do not rely on the party's characterization of the document; instead, they routinely review the document *in camera*, even though that requires the party to disclose to the court "the very thing the privilege is designed to protect." *Reynolds*, 345 U.S. at 8. That said, we of course are bound to follow the path the Supreme Court traversed in *Reynolds*, rather than the one it chose not to follow.

6

the privilege in order to determine whether the records are properly classified 'secret' by the Government"); *see also El-Masri v. United States*, 479 F.3d 296, 305 (4th Cir. 2007) ("[i]n some situations, a court may conduct an *in camera* examination of the actual information sought to be protected, in order to ascertain that the criteria set forth in *Reynolds* are fulfilled"); *Northrop Corp. v. McDonald Douglas Corp.*, 751 F.2d 395, 401 (D.C. Cir. 1984) ("when a litigant must lose if the claim [of privilege] is upheld and the Government's assertions are dubious in view of the nature of the information requested and the circumstances surrounding the case, careful *in camera* examination of the material is not only appropriate . . . but obligatory"). While a plaintiff's need for the information that the government seeks to shield cannot overcome the state secrets privilege once established, a plaintiff's showing of necessity "will determine how far the court should probe in satisfying itself that the occasion for invoking the privilege is appropriate." *Reynolds*, 345 U.S. at 11. Thus, "[w]here there is a strong showing of necessity, the claim of privilege should not be lightly accepted . . ." *Id.; see also Brown*, 619 F.2d at 1173; *El-Masri*, 479 F.3d at 305; *Northrop Corp.*, 751 F.2d at 399. With or without an *in camera* review, the burden always remains with the government to satisfy a court that the state secrets privilege applies to the information the government seeks to protect. *El-Masri*, 479 F.3d at 305.

With the guidance provided by these legal principles, we consider defendants' assertion of the state secrets privilege as to each of the categories of information in question.[7]

_____

[7] We note that to invoke the state secrets privilege, defendants must comply with certain formal requirements: "[t]here must be a formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer." *Reynolds*, 345 U.S. at 7-8. There is no dispute that defendants here have satisfied those formal requirements for invoking the state secrets privilege.

## II.

We begin by considering defendants' assertion of the state secrets privilege to bar production of information "tending to confirm or deny whether the plaintiffs are now or ever have been listed in the TSDB" (Defs.' Mem. at 4). In particular, defendants have asserted the state secrets privilege to justify redactions they have made from certain CBP records concerning the plaintiffs' various border encounters. According to defendants, the redacted information "would tend to confirm or deny TSDB status," and it would not reveal any other information for which the defendants assert protection under the state secrets privilege (12/04/07 Tr. at 26-27). We consider, in turn, plaintiffs' need for this information and the strength of defendants' assertion of the state secrets privilege.

## A.

As we previously explained in rejecting defendants' assertion of the law enforcement investigatory privilege (doc. # 254: Mem. Op. and Order at 15), we have no doubt that the information tending to confirm or deny plaintiffs' TSDB status is central to what plaintiffs describe as their "core class claims" (12/04/07 Tr. at 20). Information that would reveal whether plaintiffs are or have been in the TSDB plainly lies at the heart of their claims that they were either overclassified (that is, identified in the TSDB when they should not have been) or misidentified (that is, mistaken for individuals who were in the TSDB). The alleged overclassification and misidentification are the events that plaintiffs claim led to their improper detentions. Plaintiffs acknowledge that "knowing whether or not they are on the TSDB is key to and a necessary and essential element of proving a *prima facie* case" on plaintiffs' overclassification and misidentification claims (12/04/07 Tr. at 21). As we explained in our earlier ruling, we agree: "[i]t

8

is difficult to conceive of how plaintiffs could prove their claims [of overclassification and/or misidentification] without this information" (doc. # 254: Mem. Op. and Order at 15).[8]

Defendants argue that plaintiffs have failed to show that this information is necessary for two reasons. *First*, defendants argue that discovery may show that plaintiffs' border stops were "non-routine" and thus do not require any governmental justification (Defs.' Reply at 6; 12/04/07 Tr. 9-12). Defendants argue that if this is so, plaintiffs would not have any need to discover whether they are or have been listed in the TSDB, because that information would not bear on whether defendants were entitled to stop them. We have considered and rejected this argument earlier, on the ground that the allegations here are sufficient to bring the border encounters within the non-routine category (doc. # 254: Mem. Op. and Order at 10-14).

*Second*, defendants hypothesize that even with respect to any non-routine encounters, "discovery may show that they were predicated on conduct by plaintiffs having nothing to do with whether they were 'overclassified' or 'misidentified'" in the TSDB (Defs.' Reply at 6). Plaintiffs tested defendants' hypothetical assertion with concrete interrogatories asking defendants to state, for each border detention of a plaintiff, "all facts which formed the predicate for the action." We have reviewed defendants' responses, and we find them inadequate to undermine plaintiffs' showing of need. To begin with, defendants refuse to provide the reason for any detentions that they have chosen to categorize as "routine" (Defs.' Responses and Objections, Objection No. 7, 8). The eight

---

[8] We recognize that plaintiffs have claimed that during their detentions, they suffered deprivations of their rights (through excessive force, deprivation of property without due process, and unreasonable conditions of confinement) resulting from policies the defendants have adopted (*see* Second Amended Complaint ¶¶ 30-31). Plaintiffs assert that they could proceed with those claims, even if the overclassification and misidentification claims failed (either on the merits or because defendants succeed in their assertion of the state secrets privilege to block plaintiffs from discovery on this issue) (12/04/07 Tr. at 20). The fact that plaintiffs have other claims in the case that may remain viable does not reduce their need for the information about their TSDB status, *vel non*, in order to proceed with their overclassification and misidentification claims.

plaintiffs who claim overclassification and misidentification allege 38 separate detentions (Second Am. Compl. ¶¶ 47-84). Defendants claim 30 of those encounters were routine. For those encounters, defendants have provided no information as to why they were stopped – and, certainly, no reason that is independent for any TSDB status plaintiffs may have for the remaining eight encounters. Defendants' explanation of those encounters in their interrogatory answers do not exclude the possibility that plaintiffs were stopped as a result of alleged overclassification or misidentification.[9]

From this, we do not presume that the border stops were based on plaintiffs' being listed in the TSDB, or being mistaken for someone who was. But, we cannot ignore that defendants, who have ready access to information about the basis for the stops, failed to supply interrogatory answers that squarely showed that the stops had "nothing to do with whether [plaintiffs] were 'overclassified' or 'misidentified'" (Defs.' Reply at 6). Defendants know the names of the governmental individuals who have knowledge of the stops, which they disclose in their interrogatory responses. Defendants also indicate that there are records for all but one or two of the stops, and those records would show both why the person was referred for secondary inspection and then why certain actions were taken during the secondary inspection (12/04/07 Tr. at 6-7). In these circumstances, we reject defendants' argument that plaintiffs' showing of a strong need for information that would confirm or deny

---

[9]Defendants say three encounters resulted from plaintiffs being identified in the Treasury Enforcement Communications System ("TECS") maintained by CBP as "armed and dangerous": Mr. Ishaque (January 29, 2006); Mr. Jammal (December 27, 2005); and Mr. Bhatti (May 6, 2005). Defendants do not explain why stops were made of Mr. Rehman (June 9, 2005), Mr. Khoury (November 19, 2002), or Mr. Anwar (May 30, 2005 and April 23, 2006) (Defs.' Responses and Objections, at 9-17).

**REDACTED**

whether they are or were in the TSDB is diminished by a hypothetical that defendants' scenario has offered in their brief, but has failed to substantiate in their discovery responses.

**B.**

We now turn to the question of whether, in the face of plaintiffs' strong showing of necessity, defendants have established that "the occasion for invoking the privilege is appropriate," *Reynolds*, 345 U.S. at 10, as to the material redacted from the CBP documents. Defendants offer a variety of arguments to support their contention that confirming or denying plaintiffs' current or former TSDB status would present a reasonable danger of jeopardizing national security. To the extent that an individual is engaged in terrorism-related activity, knowledge that he or she is listed in the TSDB would cause the person "to alter the nature or extent of his terrorism-related activity, or take new precautions against surveillance, to frustrate the government's intelligence-gathering efforts.... [h]e might change his appearance or acquire false identification to avoid detection; or he might temporarily cease all terrorism-related activity, and even go into hiding, until such time as he could re-emerge and resume his activities without fear of scrutiny" (Defs.' Mem. at 7). Defendants further argue that disclosing that an individual is no longer in the TSDB could harm national security by allowing those individuals who wish to engage in terrorism-related activity to do so "without fear of detection;" for those individuals who are "entirely law abiding" but who previously had been listed in the TSDB, it could reveal to persons or organizations associating with that person "that they too were subjects of government scrutiny," which could prompt them to "take steps to avoid further detection," and could "reveal sources and methods" of gathering intelligence (*Id.* at 7-8). Defendants further argue that it is not possible to distinguish between disclosures of individual investigative status that would be harmful to national security interests and those that would not: "[i]f the

11

government were to disclose that one individual is not now nor ever has been the subject of an investigation, but refuse[d] disclosure when another individual is or has been a terrorist subject, that very act of resistance would reveal the information the government seeks to protect" (*Id.* at 8).

These arguments and the declarations that defendants have offered to support them are insufficient to establish that the state secrets privilege is applicable to the redacted information in the CBP reports. We appreciate the concerns that defendants have expressed, and we have no doubt that they are offered in the utmost of good faith. But, they are general concerns and our mission under *Reynolds* is to assess a claim of state secrets privilege based, not only on general concerns, but also from all the circumstances of the case. *Reynolds*, 345 U.S. at 10. Here each of the eight plaintiffs who were subjected to border stops claim that this occurred on 38 separate occasions, ranging from twice (in the case of Dr. Bhatti) to eleven times (in the case of Mr. Jammal).[10]

This point strikes at the heart of defendants' argument that disclosure of TSDB status would allow someone bent on terrorism-related activity to alter his or her conduct or take steps to avoid detection. The predicate assumption of that argument is that such an individual is not aware "that he is the subject of an FBI national security investigation" (Defs.' Mem. at 7). That argument could have force in a situation where a person seeking to learn of his or her TSDB status had not been stopped at the border or had not otherwise been alerted to the fact that he is under investigation. However, in this case where the plaintiffs have alleged they have been stopped at border entries on numerous occasions each (38 in all for the eight plaintiffs), there is little force to the argument that

---

[10]In particular, plaintiffs allege that Mr. Rahman was subject to border stops on four different occasions; Mr. Anwar on nine occasions; Dr. Bhatti on two occasions; Mr. Ishaque on three occasions; Mr. Jammal on eleven occasions; Mr. and Mrs. Khoury on seven occasions; and Dr. Rehman on two occasions (Second Amended Complaint ¶¶ 47-84).

revealing their TSDB status will alert these plaintiffs for the first time that they have been under government scrutiny. As we observed in our earlier ruling, "we expect that plaintiffs who have been repeatedly stopped when entering the border have been alerted to the fact that they are or may be of interest to the FBI or other governmental investigative authorities" (doc. # 254: May 1, 2007 Mem. Op. and Order at 23-24). Against this factual backdrop, we find that defendants' arguments are insufficient to show that revealing whether these plaintiffs are or were listed in the TSDB would result in disclosure injurious to national security.[11]

Defendants' argument that revealing the plaintiffs TSDB status would reveal sources and methods of information gathering (Defs.' Mem. at 8) fares no better. During oral argument, defendants stated that the redacted information from the CBP records does not contain any alleged state secret information other than information that would confirm or deny the plaintiffs' TSDB status (12/04/07 Tr. at 26-27). Defendants have offered no explanation as to how the disclosure of TSDB status, without more, would reveal the sources of information or methods of investigation.

Moreover, in assessing defendants' argument that it would invariably compromise national security to ever disclose to a person his or her TSDB status (Defs.' Mem. at 8), we consider the fact that the government on certain occasions has disclosed to persons information that would tend to confirm or deny their TSDB status. Prior to suit, ICE wrote a letter to Mr. Rahman indicating that "your clearance difficulties are the direct result of an unfortunate misidentification scenario," and that "[t]he troubles you are experiencing are the result of this type of near matching with information

---

[11]Nor are we persuaded that if a particular plaintiff here was informed that he is not (or never was) listed on the TSDB, he would be emboldened to engage in terrorist activity (Defs.' Mem. at 7-8). Again, these plaintiffs have, for some reason, all come to the attention of defendants during multiple border entries. In these circumstances, a statement by defendants that the person is not listed in the TSDB would not likely be construed by that person — or others he associates with — as a green light for activity that might bring them back under government scrutiny.

in the NCIC and TECS on another person who has the same or similar name and date of birth as yours" (Defs.' Supp. Brief, Ex. 3). In addition, CBP wrote pre-suit letters to Senators Barack Obama and Richard J. Durbin stating that Mr. Rahman "is not on record as a criminal suspect," that the Interagency Border Inspection System ("IBIS") database maintained by CBP had several entries with individuals who have the "same or similar name as that of Mr. Rahman's," and that certain identifying information provided by Mr. Rahman "will allow our offices to differentiate Mr. Rahman from the subject of the records" in the future (*Id.*, Ex. 4). While those letters did not specifically state that Mr. Rahman was not in the TSDB, defendants concede that no particular "talismanic" words have to be used to convey that information (12/04/07 Tr. at 29).

## REDACTED

Similarly, in March 2006, CBP wrote a letter to Congressman Chet Edwards of Texas concerning one of his constituents, Mr. Anwer Ahmed (Pls.' Second Supp., Ex. 1). In that letter, CBP stated that a border stop Mr. Ahmed experienced on January 2, 2006 was the result of Mr. Ahmed's name and date of birth being "the same or similar to a person of interest to CBP," and the "CBP officer's efforts to establish the difference between the two" (*Id.*). While defendants claim that this letter did not disclose TSDB status to Mr. Ahmed, we find the letter substantively indistinguishable from the letters that defendants concede implied that Mr. Rahman was not listed in TSDB at the time of his border stops. The letter to Congressman Edwards makes clear that the reason for Mr. Ahmed's stop was that his name and birth date were the same or similar to someone else who was of interest to CBP, thereby conveying to Congressman Edwards the information that

14

Mr. Ahmed, himself, was not stopped because he was a person of interest – and thus was not in the TSDB.

**REDACTED**

Defendants do not state that the explanation about Mr. Ahmed's border stop provided to Representative Edwards was false, but neither do they confirm that it was accurate: defendants say that the accuracy of what was set forth in the letter to Representative Edwards "cannot be taken for granted,

**REDACTED** (*Id.* at 15). We do not find that explanation persuasive. Defendants have stated the concern that a person inclined toward terrorist activity, who is told that he is not in the TSDB, may be encouraged to engage in that very activity (Defs.' Mem. at 7-8) – surely a result that no one wishes to occur. And, there is no evidence that Mr. Rahman or Mr. Ahmed doubted the correctness of the representations when made. Thus, **REDACTED** irrespective of the veracity of the representation concerning Mr. Ahmed, the fact remains that the government made the representations. The act of making those representations weakens defendants' claim that doing so jeopardizes national security.

We do not treat these disclosures by ICE and CBP in the cases of Mr. Rahman and Mr. Ahmed as any waiver of the state secrets privilege in information concerning others who are (or are not) listed in the TSDB. Nor do we view these disclosures as estopping the government from ever asserting state secrets privilege as to a person's TSDB status. *See Bassiouni v. CIA*, 392 F.3d 244, 247 (7th Cir. 2004) ("[I]f even a smidgen of disclosure required the [government] to open its files, there would be no more smidgens"). But, the government's decision to disclose this information about Messrs. Rahman and Ahmed to two United States Senators and one United States

Representative does bear on the credibility of defendants' assertion that it always would jeopardize national security to disclose that any individual "is not now nor ever has been the subject of an investigation" (Defs.' Mem. at 8).

Defendants argue that disclosure of this information in the past does not preclude them from concluding in another case that disclosure of like information would lead to an unacceptable risk (Defs.' Supp. Br. at 15 n.9, quoting *CIA v. Sims*, 471 U.S. 159, 180-81 (1985)). Defendants have stated that "it is not the practice anymore to tell anybody rightly or wrongly that 'You are not on the Terrorist Watch List'" (12/04/07 Tr. 41). We view this as a variation of defendants' argument that the prior statements concerning Mr. Rahman and Mr. Ahmed do not waive defendants' right to assert the state secrets privilege here. We agree that those earlier statements were not a waiver. But, as we have said, those statements do bear on the credibility of defendants' assertion that disclosing whether a person is or was on the watch list would invariably jeopardize national security. Defendants have provided no persuasive explanation why the disclosures with respect to Messrs. Rahman and Ahmed were not deemed injurious to national security, but disclosure to the plaintiffs **REDACTED** would jeopardize national security.

In the interest of completeness, we address several additional arguments plaintiffs have made in opposition to the assertion of state secrets privilege which we have not found persuasive. *First*, plaintiffs assert that TSDB status cannot be a state secret, because it is not classified information and is accessible to nearly one million members of the law enforcement community (Pls.' Mem. at 10). We agree with defendants that disclosure within the law enforcement community, which is necessary to utilize the TSDB information, does not answer the question of whether disclosure of that same

16

information outside the law enforcement community would jeopardize national security. We note that a report by the United States General Accounting Office, entitled *Terrorist Watch List Screening*, recommends that steps be taken to make the TSDB available for use by the private sector, a recommendation that DHS endorses (*see* Pls.' Third Supplement, Ex. 1, at 47-48, 55-56, 58). No timetable has been set for deciding whether to implement private sector use of the TSDB, and if so, what procedures or limitations may apply. *Second*, during oral argument, plaintiffs suggested that during the border encounters, plaintiffs were told "in so many words" that their name or similar name was on the watch list (12/04/07 Tr. at 31). After reviewing plaintiffs' interrogatory answers on this point, we are persuaded that plaintiffs' statements of what occurred fails to establish that defendants officially and publicly acknowledged the watch list status of any plaintiffs during those encounters. *Terkel*, 441 F. Supp.2d at 915 (citing *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990)).

To summarize, with respect to the information redacted from the CBP records, we find that plaintiffs have established a strong showing of necessity to obtain discovery that would confirm or deny their TSDB status, in order to pursue their core claims of wrongful detentions based on overclassification and/or misidentification. We further find that, against this strong showing of necessity, defendants have failed to establish that, under all the circumstances of this case, disclosure of that information would create a reasonable danger of jeopardizing national security. Accordingly, we deny the defendants' motion for a protective order to bar discovery of the redacted information

from the CBP records. Production of that information will be pursuant to the terms of a protective order limiting the scope of disclosure and use of that information.[12]

### III.

We now turn to defendants' assertion that the state secrets privilege bars production of the FBI investigative files for those plaintiffs who may now be listed or ever have been listed in the TSDB and any records pertaining to the plaintiffs in the TIDE. The character of the information contained in the FBI files and the TIDE database, together with plaintiffs' lower level of need for that information, persuade us that the state secrets privilege is properly invoked as to this information.

The TSDB information that plaintiffs seek would reveal only whether plaintiffs are or have been listed in the TSDB, or the names of persons for whom they may have been mistaken. The TSDB information at issue here would not reveal any details about the path of investigation that led to a person being included in the TSDB. By contrast, any FBI investigative files or TIDE database information that might exist would contain details about the information that the government has learned about someone with alleged terrorism-related activities, and the sources and methods of investigation used to obtain that information. The case law recognizes that disclosure of this kind of information would adversely affect national security. *See ACLU v. Brown*, 619 F.2d at 1174 (noting that the information there did not meet the test for state secret where it would not reveal, for example, "the extent of such surveillance, or the means by which it was accomplished").

---

[12]Because we order the redacted information to be disclosed, and because defendants have indicated that the redacted information contains no alleged state secret material other than information that would tend to confirm or deny whether plaintiffs are or have been in the TSDB, we see no reason to order an *in camera* review of those materials.

18

The fact that defendants have expressed interest in these plaintiffs, as evidenced by the frequency with which they were stopped at the border, in no way discloses what information caused any of these plaintiffs to be of interest or the investigative techniques that were used to obtain that information. Thus, disclosure of any FBI investigative files or TIDE database information "could give adversaries of this country valuable insight into the government's intelligence activities." *Terkel*, 441 F. Supp.2d at 917 (holding that the state secrets privilege was properly invoked to prevent disclosure to plaintiffs of information that would confirm or deny whether AT&T had disclosed large quantities of telephone records to the federal government).

Plaintiffs' showing of need for this information is less compelling than it was with respect to their TSDB status. There is no doubt that plaintiffs' overclassification and misidentification claims will fail if they are unable to discover whether, in fact, they are or were listed in the TSDB, a point that plaintiffs acknowledge (12/04/07 Tr. at 21). By contrast, plaintiffs have disavowed any need to discover the "methods and sources used to assemble the information in the FBI files and the TIDE database" (*Id.* at 55). While more equivocal on this next point, plaintiffs expressed uncertainty about their need for information that may exist in any FBI files and TIDE databases to show the credibility of any source of information that might have led to somebody being identified as a terrorism threat and thus being listed in the TSDB (*Id.* at 57).

Plaintiffs have not suggested that they would be unable to pursue their overclassification and misidentification claims without the information that may exist in any FBI files or TIDE database. And, we can envision how plaintiffs might be able to pursue their claims without that information. Under our ruling, plaintiffs will have information indicating whether, at the times of the border stops, they were listed in the TSDB. If they were listed in the TSDB, they will be free to offer evidence

19

to show that they had no involvement in any terrorism-related activity, and thus were overclassified. If they were not listed in the TSDB but were mistaken for those who were, they are free to offer evidence to show why that was the result of improper government policies and practices. In aid of those arguments, plaintiffs may seek to offer evidence from official government reports to attempt to prove that defendants' policies and practices cause "widespread misidentification and overclassification" (Pls.' First Supplement at ¶ 2(b), citing Ex. 3) (Report of the Office of Inspector General ("OIG") of the U.S. Department of Justice, September 6, 2007, entitled *Follow-up Audit of Terrorist Screening Center*); (Pls.' Third Supplement, Ex. 1) (United States General Accounting Office ("GAO") Report, October 24, 2007, entitled *Terrorist Watch List Screening*).

To date, defendants have not offered evidence to unequivocally show that the plaintiffs' border stops were based on some factor other than the overclassification and/or misidentification that plaintiffs allege. Defendants may persist in claiming that most of the plaintiffs' border encounters were routine and that, as a result, they have no overclassification or misidentification claim — whatever their TSDB status. Even if they prevail on that contention, the argument does not help defendants explain the reason for the stops that even defendants treat as non-routine. As for any non-routine stops (whether eight, or 38, or somewhere in between), defendants may have difficulty in arguing that plaintiffs' detentions did not result from overclassification or misidentification when they have failed to offer discovery to show why the stops were made. At some point in the case, defendants may have to confront the question of whether to provide further information to show why a plaintiff was in the TSDB (if any were), or why defendants' policies and practices do not lead to large scale overclassification and/or misidentification.

In making these observations, we are not undertaking the role of lawyer for plaintiffs or defendants; nor are we attempting to dictate how either side must try to prove its case. We make these observations only to underscore that plaintiffs' claims will not inevitably fail without access to information that may exist in any FBI files or TIDE database that defendants' claim as state secrets. As a result, plaintiffs have not made a strong showing of need for this information. Accordingly, we find that the state secrets privilege is applicable to any FBI files or TIDE database that might disclose sources of information or investigative techniques, or the details of any information that may exist about plaintiffs.[13]

That said, we are unable to determine from the materials defendants have submitted whether any information about plaintiffs that may exist in FBI files or the TIDE database is limited to sources of information or investigative techniques. We can envision the possibility that if there is any responsive information in FBI files or the TIDE database, it may contain a mixture of state secret and other information. If so, the two categories of information may be so intertwined that producing redacted versions may be impractical. On the other hand, there may be discrete items of responsive, non-state secret information that can be segregated, and that should be produced. In our judgment, *in camera* review of any responsive FBI files or TIDE database information that may exist is necessary in order for the Court to make that determination. *Compare ACLU v. Brown*, 619 F.2d

---

[13]We are mindful that earlier in the case, we denied defendants' assertion of the law enforcement investigative privilege as to any FBI files (doc. # 254: Mem. Op. and Order at 23-24). We held that the defendants' interest in protecting sources and methods of investigation could be addressed in a protective order, and did not outweigh plaintiffs' need for the information (*Id.*). However, when considering the law enforcement investigative privilege, we balance the need of the litigant seeking the information against the harm to the government from disclosure (*Id.* at 15). By contrast, once material is found to qualify for state secrets privilege protection, no balancing of interests is permitted – production of the material cannot be compelled.

at 1173 (*in camera* review appropriate to determine whether documents meet the standard of "relevance" needed to be discoverable, and are subject to state secret privilege).

Accordingly, defendants' motion for protective order to bar disclosure of any information about plaintiffs that may exist in FBI files or the TIDE database is granted, insofar as that information would reveal methods and sources of information, and the details of any information that may exist about the plaintiffs that would disclose methods and sources.[14] By April 15, 2008, defendants shall submit any responsive documents to the Court, *ex parte* and *in camera*, so that the Court can determine whether they contain any non-state secret information that is relevant and can be produced without revealing state secret information.

## IV.

We now turn to defendants' assertion of the state secrets privilege as a bar to production of two policy and procedure documents. According to defendants, those two policy and procedure documents are classified, because they relate to a "terror screening policy applied to a particular category of watch listed individuals" (Defs.' Mem. at 11). Defendants argue that plaintiffs cannot show any need for these policy documents, because "the screening policy that's discussed in those documents, over which we are claiming privilege, could not possibly have been applied to these plaintiffs during their border crossings" (12/04/07 Tr. at 46). In addition, defendants say that the

---

[14]Plaintiffs argue the GAO report shows that under the standards by which the FBI determines whether names should be forwarded to the TSDB, there is a "significant possibility" that if any plaintiffs have FBI files, then they contain "only pedestrian information that does not implicate national security" (Pls.' Third Supplement, at ¶ 2). For that reason, plaintiffs argue that the Court should engage in an *in camera* review of any FBI files (and, presumably, any TIDE database) (*Id.*). However, we wish to make it clear that we do not order an *in camera* review for this reason. In order to ascertain whether any information that might exist about one or more plaintiffs is "pedestrian," one would need to know not only the information but the sources and techniques for assembling the information; plaintiffs have expressly disavowed any interest in obtaining such information, which we would consider protected by the state secret privilege.

public GAO report that discusses certain government policies with respect to terrorist screening does not waive any state secrets privilege in those documents, because the policies set forth in those documents are not discussed in the GAO report (*Id.* at 46-47).

Unlike the case with the other categories of information over which defendants assert a state secrets privilege, we cannot resolve this particular claim without resorting to the classified material that the defendants have filed *ex parte* for *in camera* review. We have reviewed the particular declaration on which defendants rely, that of Mr. Joseph Billy, Jr., Assistant Director, Counter Terrorism Division of the FBI. Based on our review of that declaration, we are satisfied that these two policy and procedure documents fall within the state secrets privilege.

Because, like the policy and procedure documents, the contents of the Billy declaration are classified, we can go no further in this public opinion in discussing the reasons for that conclusion. We do so in a separate Memorandum Opinion and Order issued today that discusses the classified information; as a result, that Memorandum Opinion and Order will be classified and unavailable for inspection by the public or by plaintiffs' or their counsel. The Court directs that the separate, classified Memorandum Opinion and Order be held in the custody of the Court Security Office of the Litigation Security Section of the Department of Justice, so that it will be available in the event of any review of this ruling by the presiding district judge or the court of appeals. *See Terkel*, 441 F. Supp.2d at 902 (addressing procedure for handling of a judicial opinion that discusses classified information).[15]

---

[15]Plaintiffs, of course, have not been privy to either the policy documents at issue or the Billy declaration that discusses them. Plaintiffs thus urge that the Court not rely on the Billy declaration, but, instead, conduct an *in camera* review of the documents themselves (Pls.' Mem. at 18). We understand why plaintiffs make that request. However, *Reynolds* requires us to forgo *in camera* review of documents for which the government asserts the state secrets privilege if other materials presented establish that there is a "reasonable danger" that compulsion of the evidence would jeopardize national security. *Reynolds*, 345 U.S. at 10. For reasons that we cannot disclose here, but which we explain

23

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part defendants' motion for a protective order barring discovery of matters subject to the state secrets privilege (doc. #280). We deny the motion with respect to the production of redacted information from the CBP records that would tend to confirm or deny whether plaintiffs are now or ever have been listed in the TSDB; we find that the state secrets privilege is inapplicable to that information, and that defendants must produce that information to plaintiffs in this case. In the absence of any objection to this ruling, defendants shall produce this information to plaintiffs by April 15, 2008. In the event defendants object to this portion of the ruling (which we expect is likely), the Court will stay any requirement that the redacted information be produced pending ruling by the district judge on the objections.

We grant the motion with respect to the policy and procedure documents at issue, and to any responsive FBI files or TIDE database information that may exist that would disclose investigative techniques and sources, or the details of any information that may exist about the plaintiffs that would disclose techniques and sources; those materials qualify for protection under the state secrets privilege, and thus defendants are authorized to withhold them from production. However, by April 15, 2008, defendants shall submit, *ex parte* and *in camera*, any responsive FBI files and TIDE

---

in our classified Memorandum Opinion and Order, the Billy declaration satisfies the Court that the policy and procedure documents are state secrets and that the information in them has not been disclosed in the GAO report.

database information so that the Court can determine whether any of it is relevant, non-state secret, and can be segregated from state-secret information and thus should be produced.[16]

ENTER:

_____

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

Dated: April 16, 2008

---

[16]In response to the Court's May 1, 2007 discovery order, defendants also withheld five TSC policy documents that contain "sensitive security information" related to transportation, which defendants say cannot be produced unless plaintiffs first follow certain administrative procedures (Defs.' Mem. at 11-13). Plaintiffs have agreed that the parties should further discuss that issue (Pls.' Mem. at 2 n.1). During oral argument, the parties agreed that this particular issue is on the "back burner" and should not be addressed at this time (12/04/07 Tr. at 14-15). Accordingly, at this time we do not address this issue; but, we leave open plaintiffs' right to raise the issue if they so choose at a later time.