IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| M. AKIFUR RAHMAN, NIAZ ANWAR, KHALID BHATTI, SHIMROTE ISHAQUE, OUSSAMA JAMMAL, ELIE R. KHOURY, FARIDEH KHOURY, SAMMY U. REHMAN, MASOODA RAHMAN and RIFFAT MEHMOOD, | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. 05 C 3761 |
| v. | ) ) | Judge Ronald A. Guzmán |
| MICHAEL CHERTOFF, Secretary of the U.S. Department of Homeland Security, in his official capacity; ROBERT S. MUELLER III, Director of the Federal Bureau of Investigation, in his official capacity, W. RALPH BASHAM, Commissioner of U.S. Customs and Border Protection, in his official capacity; and JULIE L. MYERS, Assistant Secretary of U.S. Immigration and Customs Enforcement, in her official capacity, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

In light of the Seventh Circuit's decision in this case, *see Rahman v. Chertoff*, 530 F.3d 622 (7th Cir. 2008), and the Supreme Court's decision in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), the Court decided to revisit defendants' motion to dismiss the second amended complaint. Having reviewed supplemental submissions from the parties, the Court finds it appropriate to reconsider in part its ruling on the motion.

**Subject Matter Jurisdiction**

Though the government urges it, the Court sees no basis for reconsidering its prior ruling that plaintiffs have standing to pursue their claims, and thus, the Court has subject matter jurisdiction over this suit.

**Fourth Amendment**

Plaintiffs claim that defendants violated their Fourth Amendment rights by unreasonably searching and detaining them when they returned to the United States from trips abroad. The federal government can "conduct routine searches and seizures at the border, without probable cause or a warrant," but may need some level of suspicion to conduct nonroutine searches. *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 & 541 n.4 (1985). Routine searches are those "that do not pose a serious invasion of privacy and that do not embarrass or offend the average traveler." *United States v. Johnson*, 991 F.2d 1287, 1291 (7th Cir. 1993). To determine if a search is routine, the Court examines the overall manner in which it was conducted, including whether: (1) it exposed the entrant's intimate body parts or otherwise breached a reasonable expectation of privacy; (2) the agent came into physical contact with the entrant or used force during the search; and (3) the search exposed the entrant to danger or pain. *United States v. Braks*, 842 F.2d 509, 512 (1st Cir. 1988).

Though "routineness" ultimately depends on the facts surrounding each search, border search case law provides some guidance for making the determination. For example, searches of purses, wallets, computers and personal documents are considered routine. *United States v. Arnold*, 533 F.3d 1003, 1008 (9th Cir. 2008), *cert. denied*, 129 S. Ct. 1312 (2009) (holding that the search of a computer is routine); *United States v. Irving*, 452 F.3d 110, 123 (2d Cir. 2006) ("Routine

searches include those searches of outer clothing, luggage, a purse, wallet, pockets, or shoes . . . ."); *Johnson*, 991 F.2d at 1291-92 ("A search at the border of a traveler's luggage and personal effects is routine."); *United States v. Carreon*, 872 F.2d 1436, 1442 (10th Cir. 1989) ("Inspector Gordon's inspection of the Carreon vehicle, documents and belongings, the subsequent "pat down" of the female passenger and the detention of Carreon while Gordon went for his electric drill were all reasonable, routine border search procedures."). Searches in which the entrant is fingerprinted or photographed have also been deemed routine. *Tabbaa v. Chertoff*, 509 F.3d 89, 99 (2d. Cir. 2007) (stating that "the fingerprinting and photographing of plaintiffs does not take the searches out of the realm of what is considered routine"); *Darulis v. Clark*, No. 08cv2344 DMS (RBB), 2010 WL 962938, at *3 (S.D. Cal. Mar. 16, 2010) (same). Likewise, pat downs and searches that involve minimal force, including the brief use of handcuffs, have been held to be routine. *Tabbaa*, 509 F.3d at 99 (holding that a search in which the government agents physically moved the entrants' feet apart was routine); *United States v. Nava*, 363 F.3d 942, 946 (9th Cir. 2004) (saying that a search in which the entrant was handcuffed "for only a couple of minutes" was routine); *Bradley v. United States*, 299 F.3d 197, 203 (3rd Cir. 2002) (holding that "a standard patdown at the border" is a routine search); *United States v. Beras*, 183 F.3d 22, 26 (1st Cir. 1999) (same); *see Rahman*, 530 F.3d at 624 (saying that "intrusive searches of the body are in a special category, but this case does not concern them."); *Darulis*, 2010 WL 962938, at *3 (holding that a search in which the border entrant was handcuffed for fifteen minutes was routine). Further, border detentions of up to six hours are considered routine. *United States v. Flores-Montano*, 541 U.S. 149, 155 n.3 (2004) (saying that "delays of one to two hours at international borders are to be expected"); *Tabbaa*, 509 at 99-101 (2d. Cir. 2007) (holding that a six-hour detention was "not . . . out of the realm of what is considered

3

routine"). Even searches that have many of these features have been held to be routine. *Tabbaa*, 509 F.3d at 99-101 (holding that a stop involving fingerprinting and photographing, "intrusive question[s]," pat downs in which the plaintiffs' feet were moved apart and a six-hour detention was routine). In fact, as the *Braks* court noted, the only border searches "that have been consistently held to be non-routine are strip-searches and body-cavity searches." 842 F.2d at 513; *see Montoya de Hernandez*, 473 U.S. at 541 n.4 (saying that "strip, body cavity [and] involuntary x-ray searches" are nonroutine).

Applying these principles to this case establishes that the vast majority of the stops plaintiffs allege are routine. More than half of them lasted four hours or less and involved no searches or physical contact. (*See* Second. Am. Compl. ¶¶ 51, 52, 54, 56-58 (alleging that Anwar was stopped for one hour on May 1, 2005 and April 13, 2006, one and one-half hours on January 24, 2006, two hours on November 27, 2005, three hours on April 22, 2004, and four hours on March 15, 2004); *id.* ¶ 60 (alleging that Bhatti was stopped for one and one-half hours on August 11, 2004); *id.* ¶ 83 (alleging that Mehmood and Rehman were stopped for two hours on April 2, 2005); *id.* ¶¶ 47-49 (alleging that A. Rahman was stopped for two hours on March 31, and August 28, 2004 and three and one-half hours on September 16, 2004); *id.* ¶ 76 (alleging that E. and F. Khoury were stopped for two hours on May 30, 2002); *id.* ¶¶ 65-74 (alleging that Jammal was stopped for two hours on July 1, 2005 and December 13, 2005, two and one-half hours on March 17, 2005, three hours on June 5, 2004 and February 20, 2005, three and one-half hours on November 5, 2002 and February 15, 2004, and four hours on January 20, 2002, November 21, 2004 and December 8, 2004); *id.* ¶¶ 62-63 (alleging that Ishaque was stopped for two hours on April 30, 2005 and four hours on July 4, 2004).) Another group of stops lasted no more than two hours and involved only a pat down. (*Id.*

4

¶¶ 77-78, 80-82 (E. and F. Khoury's October 1, 2003, September 12, 2004 and February 17, 2005 and May 12, 2005 stops and F. Khoury's November 19, 2002 stop).) Two other stops lasted three hours, one of which involved a pat down and a search of personal papers and the other only a wallet search. (*Id.* ¶ 79 (E. and F. Khoury's January 29, 2004 stop); *id.* ¶ 59 (Anwar's April 23, 2006 stop).) One stop lasted four hours and involved fingerprints, photographs and a wallet search. (*Id.* ¶ 55 (Anwar's July 31, 2005 stop).) Two stops lasted five and one-half and six hours, respectively, but neither involved a search or physical contact. (*Id.* ¶ 50(e) (M. Rahman's May 8, 2005 stop); *id.* ¶ 53 (Anwar's March 21, 2005 stop).) One stop lasted two hours and involved the momentary display, but not use, of force (government agents "surrounded [plaintiff's] car") and a wallet search. (*Id.* ¶ 84 (Rehman's June 9, 2005 stop).) Another stop lasted two and one-half hours and involved the same momentary display of force, a pat down, the use of handcuffs during the walk from plaintiff's car to the security building and a wallet search. (*Id.* ¶ 61 (Bhatti's May 6, 2005 stop).) Yet another lasted three and one-half hours and involved a wallet search, non-handcuff restraint of plaintiff's hands during the walk from his car to the security building and a pat down in which the agent moved plaintiff's legs. (*Id.* ¶ 75 (Jammal's December 27, 2005 stop).) All of these stops, as plaintiffs allege them, are routine.

That leaves only three alleged stops, one of which is the November 19, 2002 stop of E. Khoury. (*Id.* ¶ 77.) This stop allegedly lasted two hours and included a pat down and examination of a book he was carrying (*id.*), all of which are elements of a routine search. But Khoury also alleges that when "[he] needed to urinate, a [government] employee escorted him into the bathroom and stood immediately behind him while he stood at the urinal." (*Id.* ¶ 77(b).) The term routine, though broadly interpreted, may not include a search in which the entrant is forced to perform a

bodily function in front of a government agent. However, Khoury's allegations do not support an inference of coercion. Though he says an agent went into the bathroom with him, Khoury does not allege that he asked the agent for privacy or that his request for privacy could feasibly have been granted. Absent such allegations, Khoury's allegations do not support the inference that this stop was nonroutine. *See Iqbal*, 129 S. Ct. at 1949 (saying that "a complaint [that] pleads facts that are merely consistent with a defendant's liability," does not state a plausible claim for relief (quotation omitted)).

Plaintiffs argue, however, that an otherwise routine search becomes nonroutine when the government knows there is no basis for it. In their view, the government knew or should have known after its first stop and release of each plaintiff that they had been misidentified as terrorism suspects. The government's failure to stop the searches in the face of this knowledge, plaintiffs say, strips the subsequent searches of the routine label.

The Court disagrees. Whether a search is routine depends on how invasive it is, not on the subjective motivation of the person conducting it. *United States v. Tsai*, 282 F.3d 690, 694-96 (9th Cir. 2002). Consequently, a noninvasive border search is routine whether the government has a good reason, a bad reason or no reason at all for conducting it. *Id.*; *see Irving*, 452 F.3d at 123 (2d Cir. 2006) (holding that a noninvasive border search is routine even if it is conducted as a pretext because "it would make little sense to allow random searches of any incoming passenger, without reasonable suspicion but require reasonable suspicion for searches of passengers that are suspected of criminal activity." (citation omitted)). Thus, even if the government knew it had no basis for conducting them, the noninvasive border searches to which plaintiffs were allegedly subjected were routine.     The two remaining stops, of A. Rahman on May 8, 2005 and Ishaque on January 29,

6

2006, are adequately alleged to be nonroutine. Rahman says his stop was five and one-half hours long, three of which he spent handcuffed to a chair. (Second Am. Compl. ¶ 50.) Ishaque alleges that a gun was drawn on him during his two-hour stop and he spent thirty minutes in handcuffs. (*Id.* ¶ 64.) Though momentary use of handcuffs is routine, handcuffing an entrant for long periods of time is not. *See United States v. Bravo*, 295 F.3d 1002, 1010 (9th Cir. 2002) (saying that handcuffing, though not determinative, "is a substantial factor in determining whether an individual has been arrested"). *Cf. United States v. Juvenile (RRA-A)*, 229 F.3d 737, 743 (9th Cir. 2000) (stating that "a reasonable person handcuffed for four hours in a locked office" would think he had been arrested). It is not clear what level of suspicion, if any, the government must have for nonroutine stops like these. *See Montoya de Hernandez*, 473 U.S. at 541 n.4 ("[W]e suggest no view on what level of suspicion, if any, is required for nonroutine border searches . . . ."). It is not, however, an issue the Court must decide because even if probable cause were required, plaintiffs' allegations do not suggest that it was lacking.

Plaintiffs allege that the government stopped Rahman and Ishaque because their names are erroneously included in the Terrorism Screening Database ("TSDB") or the border agents mistook them for TSDB-listed individuals with the same or similar names. In the former case, plaintiffs say, the TSDB does not provide probable cause because the names contained in it are generated by investigations launched "on insubstantial and highly speculative grounds." (Second Am. Compl. ¶ 3.) In other words, plaintiffs allege that the government selects individuals for the TSDB based on evidence – not fiat or chance. However, they argue that the evidence should be discounted because it was produced by investigations into less-than-compelling leads. But the Fourth Amendment does not require that probable cause be based on the highest-caliber evidence or

7

evidence gathered from unimpeachable investigations into the most promising leads. *Gramenos v. Jewel Cos., Inc.*, 797 F.2d 432, 440 (7th Cir. 1986) ("[T]he fourth amendment does not define as probable cause whatever good police practice requires, or whatever proves necessary to prevail at trial."). On the contrary, probable cause can be based on double hearsay, anonymous tips and information obtained from criminals. *Illinois v. Gates*, 462 U.S. 213, 244-46 (1983) (anonymous tip); *United States v. Farmer*, 543 F.3d 363, 377 (7th Cir. 2008) (information from criminal informant); *United States v. Wilson*, 479 F.2d 936, 941 (7th Cir. 1973) (hearsay and double hearsay). Thus, even if Rahman and Ishaque's inclusion in the TSDB prompted the nonroutine stops, the possibility that the investigations underlying the decision to include them were initiated on "speculative" leads does not disqualify the TSDB as a basis for probable cause.

Even if the TSDB can support probable cause for some stops, plaintiffs say misidentification stops are not among them because the TSDB is not amended or annotated to reflect incidents of misidentification. As a result, plaintiffs allege, an entrant whose name or other identifying information is the same as or similar to that of a person in the TSDB may be repeatedly misidentified and stopped. (Second Am. Compl. ¶ 5.) Because the TSDB has no mechanism for preventing misidentifications, plaintiffs say it cannot be the basis for probable cause for misidentification stops.

That might be true if new names or identifying were never added to the TSDB, a proposition that plaintiffs do not allege and common sense does not support. Even in the context of an evolving TSDB pool, plaintiffs' contention might have merit if Rahman and Ishaque's nonroutine stops followed on the heels of prior stops. But that is not what plaintiffs allege. Rather, they allege that Rahman and Ishaque's nonroutine stops occurred seven and nine months, respectively, after a routine stop. (Second Am. Compl. ¶¶ 49-50, 63-64.) Given the TSDB's dynamic nature, those time

lapses are too great to suggest that the nonroutine stops of Rahman and Ishaque were prompted by the same misidentifications from the same TSDB data that prompted the routine stops seven or nine months earlier. In short, even if the TSDB does not have a mechanism for ensuring that misidentifications do not occur, that flaw does not vitiate the TSDB's probable cause value for the nonroutine stops alleged in this case.

**Fifth Amendment**

Government action that infringes the right to travel abroad will be upheld unless it is "wholly irrational." *Califano v. Aznavorian*, 439 U.S. 170, 176 (1978). Plaintiffs allege that the stops to which they are subjected burden that right and, because they are based on the inherently-flawed TSDB, have no rational basis. Initially, the Court found those allegations sufficient to withstand a motion to dismiss. (*See* 7/26/07 Mem. Opinion & Order at 27-28.) However, viewed in light of the recent *Iqbal* decision, plaintiffs' conclusory allegations that the TSDB is based on "insubstantial and unreliable information" and "irrational" classifications are not sufficient to support their Fifth Amendment claim.

## **Conclusion**

For the reasons set forth above, the Court grants in part and denies in part defendants' renewed motion to dismiss the second amended complaint [doc. no. 462] and vacates the portion of its July 26, 2007 Memorandum Opinion and Order [doc. no. 285] denying defendant's Rule 12(b)(6) motion to dismiss plaintiffs' Fourth Amendment and Fifth Amendment substantive due process claims. Plaintiffs have twenty-one days from the date of this Order to amend their complaint in accordance with this Order. If they fail to do so, the Court will dismiss these claims with prejudice.

**SO ORDERED.**                                      **ENTERED: March 31, 2010**


_____
**HON. RONALD A. GUZMAN**
**United States District Judge**